Paul W. GATLIN, Appellant,

v.

UNITED STATES of America, Appellee.

Dennis O. MILLER, Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 17728–17729.

United States Court of Appeals District of Columbia Circuit.

Argued Sept. 30, 1963.

Decided Dec. 19, 1963.

---

Mr. Francis H. Caskin, Washington, D. C., with whom Mr. Gene P. Bond, Washington, D. C. (both appointed by this court) was on the brief, for appellants.

Mr. Frank Q. Nebeker, Asst. U. S. Atty., with whom Messrs. David C. Acheson, U. S. Atty., and Harold J. Sullivan, Asst. U. S. Atty., and Miss Julia P. Coop-

er, Attorney, Department of Justice, were on the brief, for appellee.

Before WILBUR K. MILLER, FAHY and WRIGHT, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge.

Appellants were named in an indictment charging two counts of robbery.[1] Gatlin was convicted of the first count [2] and acquitted of the second,[3] whereas Miller was acquitted of the first and convicted of the second. Thus all of the evidence concerning two robberies was before the jury which convicted each defendant of one robbery. We need not comment further on this joinder,[4] because the convictions must be reversed for a new trial because of police violations of the Fourth Amendment and Rule

1. 22 D.C.Code § 2901 (1961).

2. It charged a robbery at Lee's Grocery in the District of Columbia.

3. It charged a robbery at the Old Hickory Barbecue Restaurant in the District of Columbia.

4. See Rule 8(b), F.R.Cr.P. See also Rule 14, F.R.Cr.P.

5. The additional knowledge of other policemen, if any, may not be ascribed to the arresting officer here because he was not "requested or authorized by superiors or associates to make [the] arrest." See Williams v. United States, 113 U.S.App. D.C. 371, 372, 308 F.2d 326, 327 (1962). Private Fallin made the decision to arrest Gatlin on the basis of the limited information he himself possessed.

6. Bell v. United States, 102 U.S.App.D.C. 383, 388, 254 F.2d 82, 87 (1957), cert. denied, 358 U.S. 885, 79 S.Ct. 126, 3 L. Ed.2d 113 (1958), states the principle: "The sum total of the reams that have been written on the subject is that a peace officer may arrest without a warrant when he has reasonable grounds, in light of the circumstances of the moment as viewed through his eyes, for belief that a felony has been committed and that the person before him committed it. * * *"

7. The arresting officer's total information concerning Gatlin's alleged participation in the Old Hickory robbery at the time

5(a) of the Federal Rules of Criminal Procedure.

■ We treat first the circumstances. surrounding the arrest of the defendant Gatlin. In considering the evidence on which the arrest was predicated, we limit ourselves to the testimony of the arresting officer, since the answer to the question of probable cause must in this. case be found in the evidence of which he was aware [5] at the time of the arrest.[6]

At 2:00 A.M. on November 9, 1962, the Old Hickory Barbecue Restaurant in Southeast Washington was robbed. A police lookout, based on descriptions of three robbers given by the witnesses at the restaurant, was broadcast. Private Fallin, the arresting officer, testified that the lookout contained "a general description of three colored males." [7] Forty-

of the arrest is shown in Private Fallin's testimony:

"DIRECT EXAMINATION

"BY MR. SCHROEDER:

"Q. Would you state your name and duty assignment, please?

"A. Private James H. Fallin, F-a-l-l-i-n, assigned to the Canine Corps.

"THE COURT: Spell your name, please.

"THE WITNESS: F-a-l-l-i-n.

"BY MR. SCHROEDER:

"Q. How long have you been assigned to the Metropolitan Police Department?

"A. Approximately five years.

"Q. Directing your attention to November 9, 1962, did you have an occasion to respond to a call in the vicinity of South Capitol Street and Howard Road?

"A. Yes, I did.

"Q. What brought that about, if you know?

"A. Previous to the call to respond to South Capitol and Howard Road, we had received a call to respond to 8th and K Streets, or at 922 8th Street, Southeast, for a robbery that had taken place at that location. We responded to that location and it was a lookout given for three colored males that allegedly had robbed the place. About 45 minutes later, after returning back into service, we received another call to respond to South Capitol and Howard Road. The dispatcher said that a cab driver had previously made a call, and thought that three suspects allegedly

five minutes after receiving the first lookout, Fallin testified, he received another call to respond to South Capitol and Howard Streets. There he found a

could have been the ones that committed the holdup at 8th and K Streets, Southeast.

"Q. Was a description given of the— when you say a, I believe a flash, or a call—does that mean a description was given of the three individuals who supposedly robbed the Hickory House?

"A. Yes. It was a general description of three colored males.

"Q. On the second call relating to the gas station on South Capitol Street, was a description given?

"A. I don't remember.

"Q. Did you respond to the call at South Capitol Street and Howard Street?

"A. Yes, I did.

"Q. And what happened?

"A. On arriving at the scene, a cab driver and all the cruisers and scout cars were on the scene, and they pointed out to me that the suspect had fled from a cab and had taken flight behind an Esso station at that location. I immediately took the dog out of the crusier, prepared him for a track. And, as I was tracking behind the Esso station it was an abandoned car lot and places like that, high weeds, and banks, and excavation work being taken place, I injured my dog by falling over some high embankment, and on my way back from that location to meet my partner with my dog, he pointed out to me that a suspect had just come out from the area from which I just came from. I put the dog in the cruiser and went across the highway from South Capitol, down Suitland Parkway and at that time we apprehended the suspect.

"Q. Now, I want to take you back a few steps. You said that there were a number of squad cars and other police that all converged at the gas station?

"A. That is correct.

"Q. Did you know where these other squad cars were from?

"A. Several of the cars were from No. 11 Precinct and I believe there was two robbery cruisers there.

"Q. Before you proceeded to track with your dog, was a discussion held at the gas station among the officers there?

"A. Not to me. None other than that the suspect had left the cab and went a certain direction behind the filling station. That is all I knew about the discussion.

"Q. Where did you go to track—and then you went and spotted the individual that you had tracked?

"A. That is right.

"Q. You said you spotted him. Then what happened?

"A. Well, I got out of the cruiser when I saw this suspect and called to him to stop, went to the suspect, and he stopped, and I immediately frisked him down and found that he had a toy revolver on him and a large amount of change. I think—my partner then notified headquarters that we had a suspect that had a revolver and a large amount of money on him, and in a matter of a few minutes the other cars responded on the scene and I turned the suspect over to the robbery squad.

"Q. At any time during this period when you were investigating this call at South Capitol Street, were you given a description of this suspect?

"A. It was a general description; yes.

"Q. Now, did you use this description in any way with regard to your other duties?

"A. I don't understand, sir.

"THE COURT: I don't know what 'general description' means. He has used that term twice.

BY MR. SCHROEDER:

"Q. What do you mean by general description?

"A. General description, I mean, for instance three colored males, their ages from 25 to 30; medium build; weighing approximately 150 to 160 pounds; six feet of height; and the clothing they wore, dark clothing, light clothing. In this particular instance one of the lookouts read, I recall, it had a light trench coat and the suspects were about six feet tall, weighing 150 to 170 pounds.

"Q. And this was the description given at the Old Hickory House?

"A. Yes.

"Q. In that connection?

"A. Yes sir.

"Q. Did you have a description in connection with the suspect involving the call from the taxicab driver?

"A. No, I did not.

"Q. Did you yourself search the individual you arrested?

"A. Yes, I did.

"CROSS EXAMINATION

\* \* \* \* \* \* \*"

taxi driver and more police. The cab driver told Fallin that a suspicious-acting person had fled from his cab as he drove into the Esso station on that corner. Fallin proceeded to track with his dog behind the Esso station in what appeared to be an abandoned area. After searching almost an hour, however, the dog was injured and the tracking operation was discontinued.

On returning to his cruiser, Fallin testified, he met his partner. His partner told him that a man had just come out of the general area where he was searching and was at that time walking down the highway. Fallin, with his partner, then approached this man, who turned out to be Gatlin, and arrested him at approximately 3:40 A.M. He did not advise Gatlin of the reason for his arrest. On searching him Fallin found a toy pistol and approximately $50.00 in currency. Gatlin was taken to the robbery squad room at police headquarters where, after interrogation by several robbery squad officers for a period estimated by the officers to be from 15 minutes to one hour, he is said to have confessed, implicating appellant Miller, to the Old Hickory House robbery.

Gatlin was then taken with a group of police in four cars in search of Miller. After fruitless calls at the home of Miller's employer and at Gatlin's home, the officers, with Gatlin, approached the home of Miller's girl friend. Eight officers surrounded the place. When they knocked on the front door, a woman inside said that the door was broken and directed the police to come to the back door. She then went to the back door and opened it. Whereupon the officers, after identifying themselves, walked in, one apparently with a gun in his hand. After a search of the premises, they found Miller in the attic. The time of

Miller's arrest is given as 6:50 A.M. Miller was taken to the robbery squad room at headquarters and, according to the police, within a few minutes he too confessed to the Old Hickory House robbery.

Lineups were then arranged, not only for the Old Hickory House robbery, but for the earlier robbery at Lee's Grocery as well. Witnesses to both robberies were brought down to headquarters; one witness identified Gatlin as a participant in the Lee robbery and one identified Miller as a participant in the Old Hickory robbery. No other witnesses connected either appellant with either crime. At 1:22 P.M., Gatlin and Miller were brought before the United States Commissioner on a complaint charging them with the Old Hickory robbery. After the Commissioner's hearing, at 1:55 P.M., for the first time they were booked at the police station for the Old Hickory robbery.

On trial the police testified as to the evidence obtained from Gatlin's person at the time of his arrest, as well as to his alleged confession. Testimony as to Miller's alleged confession was also introduced. Under examination by Government counsel some of the witnesses to the robberies described the lineups which took place at police headquarters on the morning of November 9th. The witness who identified Gatlin as a participant in the Lee robbery and the witness who identified Miller as a participant in the Old Hickory robbery were allowed to testify that they next saw appellants at a time which corresponded with the time the lineups were held.

## I.

Gatlin's arrest was without probable cause. It was an arrest for investigation.[8] The only evidence on which the

---

8. With respect to such arrests, this court, in Wrightson v. United States, 95 U.S. App.D.C. 390, 392, 222 F.2d 556, 558 (1955), stated:

"It is perfectly true that after the arrest Wrightson was identified by the victim of the robbery and confessions were presented and received. But the

tendency of police officers to arrest people without warrants and without probable cause is a matter of vast public importance, and it has been of such importance since Colonial days. Courts cannot put a stamp of approval upon actions of the police when the officers, challenged by an accused, fail or refuse

arrest was predicated was the fact that there was a robbery, that one of the robbers was a Negro wearing a trench coat, that a Negro man fled from a taxi, and that Gatlin, a Negro man, was observed walking down the street a mile and a half from the robbery wearing a trench coat. This is not the type of evidence which would justify deprivation of liberty. Apparently the jury was not impressed. It acquitted Gatlin of the Old Hickory robbery in spite of this evidence plus the police testimony to his alleged confession.

 The manner in which Gatlin's arrest was handled by the police clearly demonstrates that it was one for investigation. He was not told the crime for which he was arrested. He was not taken to a precinct station to be booked. He was not presented without unnecessary delay to a magistrate for a hearing on probable cause. Instead he was brought to the robbery squad room at police headquarters where a battery of police proceeded to interrogate him at length in spite of the fact that, according to their own testimony, he was under the influence of alcohol. No attempt is made to explain either the action of the police in arresting Gatlin or his detention in police custody until a confession was obtained and lineups were completed.[9]

## II.

 Miller's arrest was likewise without probable cause, being based solely on information obtained from an accomplice whose reliability is neither alleged nor established. The facts with reference to Miller are remarkably close to those in Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).[10] There two accomplices in-

to demonstrate compliance with the rules which circumscribe their authority. Certainly the police have been warned enough in these respects, by the Supreme Court of the United States, by this court, and by many other courts." (Footnotes omitted.)

9. We thought we had made it clear in *Payne* that "we do not condone lengthy detention for the purpose of rounding up complaining witnesses so that they may view a suspect." Payne v. United States, 111 U.S.App.D.C. 94, 98, 294 F.2d 723, 727, cert. denied, 368 U.S. 883, 82 S.Ct. 131, 7 L.Ed.2d 83 (1961).

And as Judge Youngdahl held in United States v. Meachum, D.D.C., 197 F.Supp. 803, 805 (1961):

"* * * Desire to hold a series of lineups on charges similar to one for which probable cause may once have appeared is not such continuing probable cause as will justify retention in custody when the original cause is dissipated.

\* \* \* \* \* \* \*

"Without deciding whether it was proper, under [Rule 5(a)], for a lineup to be held on the [original] charge, it was decidedly improper for preliminary proceedings on that charge to be delayed for a lineup and questioning about another charge \* \* \*."

10. The police here, as in *Wong Sun*, acted without an arrest warrant. Thus they failed to place their information before a "neutral and detached magistrate" who obviously is in a better position to determine probable cause than an "officer engaged in the often competitive enterprise of ferreting out crime." Johnson v. United States, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948). This failure alone, absent exceptional circumstances, may be sufficient to invalidate this arrest. See Morrison v. United States, 104 U.S. App.D.C. 352, 375, 262 F.2d 449, 454 (1958); Accarino v. United States, 85 U.S.App.D.C. 394, 402, 179 F.2d 456, 464 (1949); cf. District of Columbia v. Little, 85 U.S.App.D.C. 242, 246, 178 F.2d 13, 17, 13 A.L.R.2d 954 (1949), affirmed on other grounds, 339 U.S. 1, 70 S.Ct. 468, 94 L.Ed. 599 (1950); compare Washington v. United States, 105 U.S.App.D.C. 58, 60, 263 F.2d 742, 744, cert. denied, 359 U.S. 1002, 79 S.Ct. 1142, 3 L.Ed.2d 1032 (1959). Certainly the absence of a warrant does not relieve the Government of proving probable cause for the arrest. "[I]f officers can arrest without a warrant and never be required to disclose the facts upon which they based their belief of probable cause—if, in other words, they have an untouchable power to arrest without a warrant,—why would they ever bother to get a warrant? And the same obvious conclusion follows if the courts, when an arrest is attacked as illegal, will assume, without facts, that an arrest without a warrant was for probable cause.

volved a third in a common narcotic violation and brought the officers to the home of the third party where he was arrested. The Ninth Circuit declared the arrest illegal, being without probable cause. Wong Sun v. United States, 9 Cir., 288 F.2d 366, 370 (1961). The Supreme Court found "no occasion to disagree." Wong Sun v. United States, *supra*, 371 U.S. at 491, 83 S.Ct. at 419, 9 L.Ed.2d 441. In the same case the defendant, Toy, was likewise arrested on information obtained from an accomplice. With reference to Toy the Supreme Court not only declared the arrest illegal, but held that the confession made thereafter was a fruit [11] thereof and therefore not admissible in evidence. Id. at 484–487 of 371 U.S., at 415–417 of 83 S.Ct., 9 L.Ed.2d 441. Accord, Seals v. United States, 117 U.S.App.D.C. ——, 325 F.2d 1006.

■ Here Miller's confession, obtained at police headquarters a few minutes after his illegal arrest, was inadmissible in evidence. Verbal evidence obtained from unlawful police action "is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion." Wong Sun v. United States, *supra*, 371 U.S. at 485, 83 S.Ct. at 416, 9 L.Ed.2d 441. Accord, Fahy v. Connecticut, *supra* Note 11. The Government's attempt to distinguish Wong Sun on the ground that Miller's confession was only an attenuated fruit of his illegal arrest is not persuasive. In *Wong Sun,* the illegal arrest alone made the post-arrest admissions while still in custody poisonous fruit. 371 U.S. at 484–488, 83 S.Ct. at 415–417, 9 L.Ed.2d 441.[12] Here the police, after making the illegal arrest, compounded that illegality by failing timely to book him on any charge, by failing to take him without unnecessary delay to a committing magistrate for instructions as to his rights, and by proceeding to interrogate him in the robbery squad room at police headquarters.

The evidence found on Gatlin at the time of his illegal arrest, and Miller's confession, taken as a fruit of his illegal arrest, were improperly admitted in evidence to prove the offenses of which they stand convicted. Since the convictions must be set aside, it will be unnecessary to dwell upon the Rule 5(a) violations and the illegal search for Miller. The police activity in this case with respect to unnecessary delay under Rule 5(a) and illegal search of a home, however, should not go unnoticed. In the hope of preventing repetition of such activity, and consequent reversal of convictions in other cases, we can only repeat again from Mallory v. United States, 354 U.S. 449, 454, 77 S.Ct. 1356, 1359, 1 L.Ed.2d 1479 (1957):

> "The scheme for initiating a federal prosecution is plainly defined. The police may not arrest upon mere suspicion but only on 'probable cause.' The next step in the proceeding is to arraign the arrested person before a judicial officer as quickly as possible so that he may be advised of his rights and so that the issue of probable cause may

---

To strike down all factual requirements in respect to probable cause for arrests without a warrant, while maintaining them for the issuance of a warrant, would be to blast one of the support columns of justice by law." Wrightson v. United States, supra Note 8, 95 U.S.App.D.C. at 394, 222 F.2d at 559–560. See Wong Sun v. United States, supra, 371 U.S. at 478–482, 83 S.Ct. at 412–414, 9 L.Ed.2d 441.

11. The Court also suppressed narcotics later taken from another accomplice, Yee. Since Toy's confession "led the police" to the narcotics, as to Toy this evidence too was a fruit of the illegal arrest.

Wong Sun v. United States, supra, 371 U.S. at 487–488, 83 S.Ct. at 417, 9 L.Ed. 2d 441. Just the converse situation was presented in the recent case of Fahy v. Connecticut, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963), where it was held that the defendant should have been allowed to challenge the use of his confession by showing that it had been induced by his being confronted with illegally seized evidence.

12. See especially 371 U.S. at 486 n. 12, 83 S.Ct. at 417, 9 L.Ed.2d 441, citing with approval Bynum v. United States, 104 U.S.App.D.C. 368, 262 F.2d 465 (1958).

be promptly determined. The arrested person may, of course, be 'booked' by the police. But he is not to be taken to police headquarters in order to carry out a process of inquiry that lends itself, even if not so designed, to eliciting damaging statements to support the arrest and ultimately his guilt."

■ With reference to the entry of the home in search for Miller, we find our own case, Judd v. United States, 89 U.S.App.D.C. 64, 65–66, 190 F.2d 649, 650–651 (1951), instructive:

"Searches and seizures made without a proper warrant are generally to be regarded as unreasonable and violative of the Fourth Amendment. True, the obtaining of the warrant may on occasion be waived by the individual; he may give his consent to the search and seizure. But such a waiver or consent must be proved by clear and positive testimony, and it must be established that there was no duress or coercion, actual or implied. Amos v. United States, 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654; United States v. Kelih, D.C. S.D.Ill.1921, 272 F. 484. The Government must show a consent that is 'unequivocal and specific' (Karwicki v. United States, 4 Cir., 55 F.2d 225, 226), 'freely and intelligently given.' Kovach v. United States, 6 Cir., 53 F.2d 639. Thus 'invitations' to enter one's house, extended to armed officers of the law who demand entrance, are usually to be considered as invitations secured by force. * * *" (Footnote omitted.)

Moreover, the fact that the search is made without warrant does not eliminate the necessity of compliance with 18 U.S. C. § 3109. Before entering to search or make an arrest, an officer must announce his purpose as well as his authority. Wong Sun v. United States, supra, 371 U.S. at 482, 83 S.Ct. at 414, 9 L.Ed.2d 441; Miller v. United States, 357 U.S. 301, 306, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958). Here, admittedly, there was no announcement of purpose prior to entry. Even assuming probable cause for Miller's arrest, this failure alone makes the arrest illegal. *Ibid.*

In order to avoid another possible reversal here, it should be noted that, since the defendants were identified at a lineup after their illegal arrests and during a period of unnecessary delay, the teaching of Bynum v. United States, *supra* Note 12, is equally applicable to this case, notwithstanding that the Government brought this fact to the attention of the jury in two steps rather than one. See United States v. Payne, D.D.C., Criminal No. 972–60, February 9, 1961, affirmed, 111 U.S.App.D.C. 94, 97, 294 F.2d 723, 726 (1961).

Reversed.

WILBUR K. MILLER, Circuit Judge, dissents.