Elroy LEWIS, Appellant,

v.

UNITED STATES of America, Appellee.

Bobby LEWIS, Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 21596, 21683.

United States Court of Appeals District of Columbia Circuit.

Argued Feb. 13, 1969.

Decided May 15, 1969.

Petition for Rehearing in No. 21596 Denied Aug. 13, 1969.

---

2. Brief for Appellant at 20.

Mr. John O. Harper, Washington, D. C., for appellant in No. 21,596.

Mr. Charles R. Donnenfeld, Washington, D. C., with whom Mr. Harry M. Plotkin, Washington, D. C. (both appointed by this court) was on the brief, for appellant in No. 21,683.

Mr. John G. Gill, Jr., Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., Frank Q. Nebeker and Victor W. Caputy, Asst. U. S. Attys., were on the brief, for appellee.

Mr. Robert S. Bennett, Asst. U. S. Atty., also entered an appearance for appellee in No. 21,596.

Before FAHY, Senior Circuit Judge, and BURGER and TAMM, Circuit Judges.

TAMM, Circuit Judge:

On April 5, 1966, Mr. Louis Brodsky was shot fatally while working in his liquor store. Appellants were each indicted and charged with felony murder (22 D.C.Code § 2401), robbery (22 D.C. Code § 2901), unauthorized use of an automobile (22 D.C.Code § 2204) and carrying a dangerous weapon (22 D.C. Code § 3204). Appellants were tried in a joint trial by jury which resulted in Elroy Lewis being convicted of felony murder, robbery, unauthorized use and carrying a dangerous weapon. He was sentenced to life imprisonment. Bobby Lewis was found not guilty of felony murder but was convicted of robbery, unauthorized use and carrying a dangerous weapon. He was sentenced to 5 to 15 years for robbery and one to three years for unauthorized use, these two sentences to run consecutively. He also received a concurrent sentence of four months to one year for carrying a dangerous weapon. Both appellants seek reversal of their convictions. We find that neither appellant merits such relief.

At approximately 3:00 p. m. on April 5, 1966, Mr. and Mrs. Lewis (no relation to appellants) left their apartment in the northeast section of Washington, D. C., and proceeded to Edgewood Liquors, a nearby store. They testified that as they approached the entrance of the store, they encountered a man leaving the store wearing a ski mask and carrying a gun. They testified further that this man brushed by them and walked rapidly toward a parked car occupied by three Negro males. At this point the Lewises entered a gas station located at the corner and the aforementioned car drove away hastily. The only information communicated to the police (Scout

Car 121) was that a holdup and a robbery had just occurred at Fourth Street and Rhode Island Avenue, N. E. As the officers approached the area of the crime they observed a Mr. Taylor waving his arms at their vehicle.[1] Mr. Taylor testified that he had been working in the gas station located at Fourth Street and Rhode Island Avenue when the Lewises "came running into the shop there and asked to call the police. * * *" (P.H. Tr. 29.)[2] Mr. Taylor testified further that he saw a green car "going around the corner at a tremendous pace of speed" and that he "flagged * * * down" the police car (P.H. Tr. 30). According to the testimony of both the two officers in the squad car and Mr. Taylor, a high speed chase ensued. The police car did not always maintain sight of this green car but various citizens along the route pointed out the direction it was taking. Finally, as the police car was rapidly racing (50–60 mph) up Rhode Island Avenue, one of the officers noticed a green car turning onto V Street. Mr. Taylor testified that he immediately recognized the vehicle as "the car that left the liquor store" (P.H. Tr. 31). Since their car was going too fast to enable them to turn onto V Street, the officers proceeded into the next intersection and, as they went around the corner, they saw the green car "in the middle of the street" and four Negro males about 50 feet away. The officers promptly placed the four men under arrest. The entire chase encompassed only four minutes, the radio alert of the robbery was broadcast at approximately 3:01 p. m. and the arrest was accomplished at 3:05 p. m. (Tr. 69).

Incident to this arrest appellants were searched. On the person of Bobby Lewis was found a red ski mask, a .45 caliber pistol, $80 in cash and a manila envelope containing change.[3] On the person of Elroy Lewis was found a black ski mask and $90 in cash. In addition, as appellants were being searched a witness (Mrs. Warren) testified that from the vantage point of her second floor window she saw Elroy Lewis toss a gun into the car in front of which appellants were being searched. She informed the police of this and they recovered a .38 caliber pistol from the car. An FBI ballistics report confirmed the fact that this gun was the murder weapon.

A hearing on a pretrial motion to suppress was conducted at which appellants argued for the suppression of all the items taken from them. (M. Tr. 13–106.) After hearing oral argument by counsel, the trial judge denied appellants' motion to suppress.

On the second day of trial, the court conducted a hearing out of the presence of the jury in order to determine whether a lineup, which was held on the day of the crime for the Government witnesses, was constitutionally valid. The trial judge concluded that the lineup procedure comported with due process of law and allowed the witnesses to testify concerning their identifications at that time.

I

Both appellants argue forcefully that the police lacked probable

1. Mr. Taylor died after he testified at the preliminary hearing and before the trial began. There is a dispute as to what, if any, details of the crime Mr. Taylor conveyed to the police after he entered their car. Since Mr. Taylor did not testify directly on this point we are treating his testimony as only disclosing to the police that he saw a green car speeding around the corner. In this regard the Government argues that even if Mr. Taylor revealed nothing else the police had probable cause to arrest appellants (see part I of text, infra).

2. P.H. Tr. indicates citation to the Preliminary Hearing Transcript. Tr. indicates citation to the Trial Transcript and M. Tr. indicates citation to the Pretrial Motion to Suppress Transcript.

3. At trial Mrs. Brodsky (wife of the deceased store owner) testified that the Bank of Commerce envelope that was found on Bobby Lewis was present in her husband's store and that she had seen it there on the day of the crime (Tr. 9–11, 19–21.) In addition, Mrs. Brodsky also testified that approximately $160 to $170 was missing from the store (Tr. 13).

cause to arrest them and that consequently all the items seized from them must be suppressed. As to this issue both appellants propound the same argument; indeed, they recognize that the money, the masks, the manila envelope and the murder weapon constitute "key prosecution evidence" (Brief for Appellant Bobby Lewis at 22). In order to determine whether probable cause existed at the time of appellants' arrest we must follow the applicable standard set out by the Supreme Court:

> Probable cause exists where 'the facts and circumstances within * * * (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed.[4]

Thus the conduct of the police in this case must be gauged by a test of *reasonableness*. In this regard we must not lose sight of the fact that, in order to establish probable cause, "[m]uch less evidence * * * is required [than that necessary] to establish guilt."[5] We must also remember that

> [t]he test of probable cause is not what reaction victims—or judges— might have but what the totality of the circumstances means to police officers. Conduct innocent in the eyes of the untrained may carry entirely different 'messages' to the experienced or trained observer (footnote omitted).[6]

We now must apply the standards enunciated above to the particular facts and circumstances of the case before us. Upon close inspection, the record reveals two police officers responding to a radio alert that a holdup and a robbery had just occurred. Upon arrival at the scene of the crime, they encounter a citizen who tells them, at the very least, that he saw a "speeding green car" leave the scene of the robbery. The police follow his directions, aided by two different citizens who are in the street pointing the way, and then observe a green car turning a corner. As the officers proceed around the block they come upon a green car abandoned in the middle of the street[7] and four Negro males walking away from the car, less than one-half block in distance. From these facts we conclude that the police were obviously in "hot pursuit" of their suspects and consequently we feel that any course of action, other than arresting appellants, would have constituted a dereliction of their duty to the public.

4. Brinegar v. United States, 338 U.S. 160, 175–176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). *Accord*, Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). While the Supreme Court's opinion in *Brinegar* is generally recognized as the standard-bearer in the probable cause area it is interesting to note that as early as 1813 the eminent Chief Justice Marshall counseled us that "the term 'probable cause,' according to its usual acceptation, means less than evidence which would justify condemnation. * * *" Locke v. United States, 11 U.S. (7 Cranch) 339, 348, 3 L.Ed. 364 (1813).

5. Bailey v. United States, 128 U.S.App. D.C. 354, 357–358, 389 F.2d 305, 308–309 (1967).

6. Davis & Sams v. United States, 133 U.S. App.D.C. 172, at 174, 409 F.2d 458, at 460 (decided February 18, 1969).

7. Appellants vehemently protest the use of the word "abandoned" and claim that "middle of the street" means or could mean the vertical middle rather than the horizontal middle. We find their semantical argument not only unpersuasive but unsupported by the record. At the motion to suppress hearing Private Anderson testified as follows (M. Tr. 66):

> Q * * * Was it [the green car] as if it were just driven in the street and stopped in the middle of the street and abandoned or was it side ways, or was it pulled into the curb?
> A To the best of my recollection I would say it looked like it was just left in the middle of the street.

In any event, we find that this insignificant point is not crucial to our decision in this case.

Appellants contend that our decision in Gatlin v. United States, 117 U.S.App.D.C. 123, 326 F.2d 666 (1963), requires us to reverse their convictions for want of probable cause. We cannot agree. *Gatlin* involved an arrest of a person in an area remote from and unconnected with the crime except for an unsubstantiated "tip" from a cab driver that a suspicious acting person had recently fled from his cab. Not long ago, however, we held in Bailey v. United States, *supra* note 5, that *Gatlin* did not apply to a situation similar to this one where the police are attempting to follow an automobile on the basis of reliable information directly connecting it with the commission of a crime. We are convinced beyond the slightest doubt that the conduct of the police in apprehending appellants falls well within the boundaries which delineate the scope of the probable cause area of our criminal law. The officers in this case are to be commended, not chastised, for their actions.

## II

Appellant Elroy Lewis [8] contends that the lineup procedures employed on the day of the crime were violative of his right to due process of law. The lineup complained of was held on April 5, 1966, and thus United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), do not affect appellant's claims since these decisions were specifically made prospective only. Stovall v. Denno, 388 U.S. 293, 300, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). Appellants, of course, are entitled to have all proceedings involving them conducted fairly and with the requisite due process the law affords. The applicable standard in the "lineup" area of the law is set forth in Stovall v. Denno, *supra*, which reinforced Palmer v. Peyton, 359 F.2d 199 (4th Cir. 1966) (en banc). More specifically, the court in *Stovall* provided that

> it remains open to all persons to allege and prove * * * that the confrontation resulted in such unfairness that it infringed his right to due process of law. * * * (The) question * * * (is whether) the confrontation conducted in this case was so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law. This is a recognized ground of attack upon a conviction independent of any right to counsel claim.

(388 U.S. at 299, 301–302, 87 S.Ct., at 1971.) With this standard in mind we have scoured the record in this case and find no irregularity. In addition, we have carefully examined a photograph of the lineup and we find it highly acceptable [9] (*see* Government exhibit No. 4). Moreover, not only is there no marked disparity in appearance but the seven members could choose any position or place in the lineup that they desired.

After we found that the lineup itself was valid, we then inspected the record in reference to all the proceedings surrounding it. Three witnesses viewed the lineup. Mrs. Warren, the woman who observed the arrest from her upstairs window, positively identified both the appellants (Tr. 139). Mr. and Mrs. Lewis, the couple who were present at the scene of the robbery, each identified numbers 2, 4, and 7 in the lineup (Tr. 180, 227). Both stated that No. 2 was the driver of the car. Neither was a "positive" identification. In fact, Mrs. Lewis, at trial, was unable to remember whom she identified until her memory was refreshed by a statement given by her on April 5, 1966. After the identifications by the witnesses were completed,

---

8. Bobby Lewis does not challenge the lineup proceeding in his brief before this court.

9. The lineup was perfectly valid from a physical standpoint in that neither of the appellants "stood out" as did the petitioner in Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969).

it was revealed to them that Elroy Lewis was No. 2 and that Nos. 4 and 7 were individuals not connected with this crime.

■ On appeal, appellants challenge the hereinbefore described lineup identification by means of myriad unsubstantiated allegations which simply have no basis whatsoever in the record (see, e. g., Brief for Appellant Elroy Lewis at 24–25). The learned trial judge conducted a hearing, out of the presence of the jury, in which all aspects of the lineup proceeding were examined. At the conclusion he decided that there were no prejudicial aspects and he allowed the three witnesses to testify at trial. Thus, the facts and circumstances surrounding the lineup were disclosed and discussed fully before the jury, including the identification of two persons unrelated to this crime and the substantially less than positive identification testimony of the witnesses. In this regard, it should be stressed that the Government did not claim to have nor is it required to have positive identification testimony before the jury can hear it. It is the jury's function to evaluate the inconsistencies and doubtfulness of each witness. We noted recently that

> the fact of inconsistencies among witnesses does not require that the testimony be rejected by a trier or triers of fact, but is simply a factor to be considered.[10]

We reinforce this concept again today and find that the lineup procedures employed completely comported with due process and that it was proper for the trial judge to submit all the testimony of the witnesses at the lineup to the jury for its consideration.

We have thoroughly considered each of appellants' other allegations of error and we find that they do not warrant extended discussion.[11] Since the officers had probable cause to arrest appellants and since their trial was fairly conducted in all aspects, the convictions of each must be

Affirmed.

10. Coates v. United States, 134 U.S.App. D.C. 97, 99 at 413 F.2d 371 at 373 (decided April 7, 1969).

11. During the preparation of this opinion appellant Elroy Lewis, *pro se*, filed a petition for a writ of mandamus seeking an order overturning his conviction and ordering a new trial because the Government knowingly used perjured testimony. This petition was denied since, regardless of the merits of appellant's claim, his petition does not state grounds for the issuance of a writ of mandamus. *See* Will v. United States, 389 U.S. 90, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967).

In addition appellant's claim cannot prevail on the merits. Briefly, he contends that a witness (Mrs. Arvia Lewis) committed perjury by deliberately testifying differently at trial than she did before the grand jury. During the trial appellant demanded that the trial be halted so that he could have an immediate hearing on this question. The trial judge, in the exercise of his discretion, refused to stop the trial but did order that the grand jury minutes of Mrs. Lewis' testimony be prepared and turned over to appellant for his use (Tr. 274–275). Upon receipt of the grand jury minutes neither defense counsel nor appellant, *pro se*, attempted to impeach the witness by prior inconsistent statement. This failure to impeach by means of the grand jury minutes indicates that defense counsel was satisfied that any inconsistencies were not crucial and, in any event, the failure to utilize the grand jury minutes at trial precludes appellant from prevailing on his present claim here on appeal. We find therefore that the trial judge did not abuse his discretion by not holding an immediate hearing and that appellant's claim is without merit.