Robert HAYWOOD, Jr., Appellant,

v.

UNITED STATES, Appellee.

No. 88–1033.

District of Columbia Court of Appeals.

Argued Dec. 4, 1989.
Decided Nov. 14, 1990.

Carol Steiker, Public Defender Service, with whom James Klein, Henderson Hill, and Santha Sonenberg, Public Defender Service, were on the brief, for appellant.

Mary B. Murphy, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher and Patricia A. Broderick, Asst. U.S. Attys., were on the brief, for appellee.

Before ROGERS, Chief Judge, BELSON, Associate Judge, and MACK, Senior Judge.

## I.

MACK, Senior Judge.

Appellant challenges his conviction, after a stipulated bench trial, for possession with intent to distribute dilaudid in violation of D.C.Code § 33–541(a)(1) (1988 Repl.). He contends that the trial court erred in denying his motion to suppress based upon allegations that the police lacked probable cause to effect his warrantless arrest. Finding that his position is supported by, and that our holding is compelled by our en banc decision in *Smith v. United States*, 558 A.2d 312 (D.C.1989), we reverse.[1]

Briefly, evidence developed at the hearing on the motion to suppress shows that appellant Haywood was arrested on January 23, 1984, (at approximately the same location that the appellant in *Smith, supra,* 558 A.2d at 313, was arrested on March 22, 1984) when a "jump-out" squad of four undercover agents appeared on the scene. Sergeant Miller, the only officer to testify at the hearing, described the circumstances thusly: in response to a lookout flashed by Officer Romano of the Narcotics Task Force that a black male dressed in a tan and brown hat, a tan jacket and black pants, was holding narcotics for distribution near a trash barrel at 12th and U Streets, N.W., he (Miller), Sergeant Szewczyk, and Officers Franck and Markovich arrived at the scene in an unmarked police cruiser at 1:50 p.m. Miller saw the described individual, later identified as Irving Tate, standing some twenty-five feet south of the trash barrel. Tate had his hands in front of him and appellant Haywood was standing within reaching distance of Tate. There were three other people in the area.

Sergeant Miller testified that from a distance of twenty-two feet, he saw appellant hand green folding money but no coins to Tate; he did not see Tate hand anything to appellant. He and the other officers exited the vehicle. Tate observed the police approach, and thereafter appellant "kind of pushed-off" from Tate and began to walk in the direction of the trash barrel. Tate walked in the opposite direction.

Miller approached Tate, and in searching him, found no narcotics, only an undetermined amount of money in his pockets and coins clenched in his hand.[2] Simultaneously Officer Franck stopped appellant, searched him and discovered the sixty-six dilaudid tablets which became the subject matter of the motion to suppress.

Sergeant Miller further testified that he had been a police officer for thirteen years, during which he had made a "couple of

---

1. We also hold that reversal is warranted because the government did not present any evidence regarding the personal observations of the arresting officer which allegedly gave him probable cause to arrest appellant.

2. The record is somewhat confusing as to what Tate, who was not arrested, had clenched in his hand. Miller at first spoke of only "coins" being clenched in the hands of Tate; later when the court asked how many bills were clenched in Tate's hand, Miller answered, "It was like two or three."

thousand arrests," three to four hundred of those being drug arrests. He had made twenty such arrests in the area where appellant was arrested and was familiar with the trash barrel where drug sellers congregated during the winter months. He had learned, subsequent to appellant's arrest, that Officer Romano, who broadcast the lookout for Tate, had personal knowledge that the informant was very reliable, was responsible for the seizure of $7,000 worth of narcotics and two motor vehicles, and had provided information leading to twenty narcotics arrests and the capture of two fugitives. Miller further testified that Officer Romano had informed him that the informant had personally observed the man bearing the description of Tate distributing narcotics in the area of the trash barrel on the day in question.

The trial court rejected appellant's claims that the officers lacked probable cause to arrest him under the total circumstances and that in particular they lacked knowledge of the informant's reliability. Relying upon the informant's past history culled subsequent to appellant's arrest, the court found that the informant was reliable and that the arresting officer was entitled to rely upon the information relayed in the broadcast. The court indicated that there would be a different situation if the information were "bad." It also reasoned that it might agree with the defense that there would be no probable cause if two people in a high narcotics area had been seen exchanging money, but that when a person in a high narcotics area gives money to an identified drug dealer, and then walks away when the police arrive, the totality of circumstances gives the police probable cause to arrest.

Subsequent to the trial court's denial of the motion to suppress, appellant gave up his right to a jury trial in return for an agreement by the government not to file "life papers" with respect to prior convictions. The facts as to the arrest and seizure were stipulated to by the parties, and the trial court denied a motion for judgment of acquittal. Appellant, who was sixty-six years old at the time of trial, testified that he was enrolled in an alcoholic drug abuse program at St. Elizabeth's Hospital, that at the time of his arrest he possessed the dilaudid for his own use to alleviate a painful and debilitating foot condition, and that he did not know Tate. Conviction followed.

## II.

■ The trial court, at the time it wrestled with and denied appellant's motion to suppress, did not have the benefit of this court's reasoning in *Smith v. United States, supra,* 558 A.2d at 312 (en banc). As appellant's counsel here suggests, the factual scenario present in *Smith* is strikingly similar to that in the instant case, and we can conclude from the government's attempt to distinguish *Smith,* that as to this claim, there is hardly room for dispute. However, the government's focus upon other factual scenarios purportedly in accord with its position (scenarios garnered from cases decided prior to our en banc decision in *Smith*)[3] does not convince us that *Smith* is not controlling here.

---

3. *United States v. Bennett,* 514 A.2d 414 (D.C. 1986), cited by the government, is distinguishable from the instant case. First, the actions of the police officers in *Bennett* were deemed to constitute a *Terry* stop, and thus were reviewed under a more lenient standard. *Bennett, supra,* 514 A.2d at 416; *see also Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In addition, the police in *Bennett* not only witnessed an exchange of money between two individuals standing by appellant, but also saw appellant reach into his waistband. Based on their experience in narcotics cases, these officers knew that appellant's actions were consistent with those of a "holder," a person who holds drugs while his partner handles the money in a narcotics transaction. *Id.* at 415. Here, by contrast, the officers only saw appellant hand money to Mr. Tate. Similarly, in other cases cited by the government there were more factors giving rise to probable cause than are present here; either the police witnessed the appellant engaged in a two-way exchange which was characteristic of narcotics transactions, *see United States v. Lucas,* 250 U.S.App.D.C. 264, 265–66, 778 F.2d 885, 886–87 (1985); *United States v. Green,* 216 U.S.App.D.C. 329, 331, 670 F.2d 1148, 1150 (1981); *United States v. White,* 211 U.S. App.D.C. 72, 73, 655 F.2d 1302, 1303 (1981); *Tobias v. United States,* 375 A.2d 491, 492 (D.C. 1977); *Peterkin v. United States,* 281 A.2d 567, 568 (D.C.1971), *cert. denied,* 406 U.S. 922, 92

In *Smith* the en banc majority held that the totality of circumstances (similar to those present here) did not give the police a sufficient basis to conduct a *Terry*[4] stop. *Smith, supra,* 558 A.2d at 313. The government in the instant case is met at the outset, therefore, with the proposition that its burden to justify probable cause to arrest is greater than it would be under the *Terry* standard. *See id.* at 315 n. 5; *see also Alabama v. White,* —— U.S. ——, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990). In this regard, the parroting of phrases, such as "high crime area," that conjure up inferences of proper police conduct without regard to the reasonableness of police actions given the circumstances of an individual case, may do violence to the rationale of *Smith.* In *Smith,* we served notice that, despite the crisis we face as a result of the illicit drug market, we would not subvert Fourth Amendment rights by lending approval to street police actions that were not based upon rational and reasonable beliefs. Thus, we specifically reiterated our rejection of articulable suspicion arguments based upon guilt by association. *Smith, supra,* 558 A.2d at 314–15. We held that the knowledge of trained investigators that drug sales are often conducted in teams was not without limitations. *Id.* at 315. We held that the character of the neighborhood will not, without more, justify an inference of criminal conduct. *Id.* at 316. We held that these factors, taken collectively with rational inferences to be drawn therefrom, fell short of warranting a Fourth Amendment intrusion. *Id.* Finally we held that flight from authority, leaving a scene hastily, or avoidance of police, without circumstances indicating a con-

sciousness of guilt, would not justify detention. *Id.* In this regard, for reasons similar to those causing us to reject associational taint, we rejected the notion of locational taint "whereby an individual's behavior is explained by reference to what others in that area or neighborhood may know about the arrest procedures of the police department." *Id.* at 317.

Measured by these considerations, even if we assumed that the government met its burden of showing that the "tip" which the officers received came from a reliable source,[5] we are nevertheless required to reverse appellant's conviction. Appellant was not the subject of the tip. There was absolutely no evidence that the officers had seen him before. Although there was evidence that Tate observed the police officers approach, there was no evidence that appellant recognized the officers, or even saw them, and the trial court made no finding to that effect.

The government, in asking us to imply "consciousness of guilt" in this case from the evidence of the arrival of the police and the unremarkable conduct of the men thereafter, is requesting more than we can legitimately give. We cannot infer that appellant saw the arriving car, and even if he did, we could not infer that he recognized it as a police cruiser. *See Smith, supra,* 558 A.2d at 317. Indeed, on this record we cannot even infer that Tate knew that the unmarked car was a police cruiser. *Id.* Certainly we cannot infer that a colloquy between a trial judge, a witness and a counsel represents a finding by the court that appellant recognized the police.[6] In

---

S.Ct. 1788, 32 L.Ed.2d 122 (1972), or the officers saw the appellant actually handling what appeared to be narcotics, *Munn v. United States,* 283 A.2d 28, 29–30 (D.C.1971), or the appellant had been the subject of an informant's identification prior to the arrest. *Allen v. United States,* 496 A.2d 1046, 1047 (D.C.1985).

4. *Terry v. Ohio, supra note 3,* 392 U.S. at 1, 88 S.Ct. at 1868.

5. Appellant is correct when he suggests that the reliability of the informant should have been known to Officer Romano, who flashed the lookout, *at the time* when he asked any other police officers to act upon the tip. *See Alabama*

*v. White,* —— U.S. ——, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990); *Glass v. United States,* 395 A.2d 796, 804 n. 18 (D.C.1978); *Clarke v. United States,* 256 A.2d 782, 785 (D.C.1969). The record does not indicate when Officer Romano learned the facts upon which he based the conclusion that the informant was reliable.

6. The government relies on the following colloquy involving Sergeant Miller to support an inference that appellant was aware that police officers had arrived on the scene:

The Court: Let me interrupt for one second. Was it an unmarked cruiser or a private vehicle?

this regard, the trash barrel which appellant walked toward loses any sinister connotations where, in the light of an early January afternoon, there may be a need for warmth and companionship. We are not sure what the "push-off" between the two men means in this context, and nothing in the record provides clarification, but, unquestionably, the "push-off," even coupled with appellant's movement towards the trash can, does not amount to such flight as would give rise to an inference of guilt. *See Smith, supra,* 558 A.2d at 316–17 (fast walk did not constitute "flight" in absence of police announcement of identity); *Waters v. United States,* 311 A.2d 835, 836–37 (D.C.1973) (stuffing money into envelope while a known drug addict approaches and turning away after seeing officer did not give rise to probable cause); *cf. Bennett, supra,* 514 A.2d at 416–17 (running away at officer's approach while attempting to remove suspected narcotics from pants constituted "flight").

■ Perhaps the most pressing point of departure from *Smith* which the government urges upon us as a distinction is that appellant was seen by Officer Miller handing money to Tate—the subject described in the tip. As a theory justifying appellant's arrest, however, this argument fails because of the facts, and thereby underscores the danger of permitting intrusions as a result of unwarranted assumptions and inferences. Thus, we agree with the trial court that the handing of money by one person to another person, standing alone, cannot give rise (in any neighborhood) to the implication that there is criminal activity afoot sufficient to give rise to probable cause to arrest.[7] Furthermore, we cannot justify appellant's seizure factually or legally on the ground that the arresting officer thought that appellant was a customer, a "juggler," or otherwise connected to Tate. *See Smith, supra,* 558 A.2d at 315; *see also Ybarra v. Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 342, 62 L.Ed.2d 238 (1979) (mere proximity to others suspected of criminal activity does not, without more, give rise to probable cause).

■ But even if the allegation in the tip that Tate (who eventually was allowed to walk away) was a narcotics distributor was sufficient to warrant a seizure of appellant, the government would be in no better position. This is so because Officer Franck, who arrested appellant, did not testify at the suppression hearing. According to Sergeant Miller, who did testify, Franck was confronting appellant simultaneously with Miller's confrontation of Tate. The trial court made no findings regarding the facts within Officer Franck's knowledge, however, and there was no evidence presented at the suppression hearing upon which the court could have based such a finding. On this record we do not know what Officer Franck observed that allegedly gave him probable cause to arrest appellant. We do not know the depth of his experience, whether he observed that Tate matched the description in the lookout, whether he saw appellant hand Tate money, or whether he even heard the broadcast. Sergeant Miller's testimony throws no light on the matter, as he testified that he did not know exactly what was transpiring between appellant and Officer Franck. The trial court could not have inferred that Officer Franck observed the same things that Officer Miller observed, even though they were in the same general location. While the collective knowledge of the police can give rise to a valid arrest, this is so only if the arresting officer acts in response to a broadcast or other directive which is based on the collective information. *See Gatlin v. United States,*

The Witness [Sergeant Miller]: It was an unmarked police cruiser.
The Court: Okay, with the antennas and the whole bit?
The Witness [Sergeant Miller]: Probably it didn't have an antenna.
Mr. Bleeker [appellant's counsel]: One of *those that fools only those of us who are law abiding.*

The Court: That's why I was asking. Go ahead. And not even some of us.

7. The court, having no idea that it would try the case, speculated that the factual pattern would be consistent with a holder paying off his runner.

117 U.S.App.D.C. 123, 125 n. 5, 326 F.2d 666, 668 n. 5 (1963); *Glass, supra*, 395 A.2d at 804 n. 18.

■ Where, as here, an arrest is predicated in part on an officer's personal observations concerning a criminal act, we must examine the information available to that officer. *See Smith v. United States*, 123 U.S.App.D.C. 202, 204, 358 F.2d 833 (1966), *cert. denied*, 386 U.S. 1008, 87 S.Ct. 1350, 18 L.Ed.2d 448 (1967); *accord Rucker v. United States*, 455 A.2d 889, 891 (D.C. 1983). We cannot justify the arrest of an otherwise unidentified citizen in a fast moving street scene where that justification is not based on information which *the arresting officer himself* possesses. *See Gatlin, supra*, 117 U.S.App.D.C. 123, 125 n. 5, 326 F.2d at 668 n. 5. An arresting officer need not have firsthand knowledge of the facts giving rise to probable cause *provided that he or she is acting at the suggestion of someone who does*. *See Glass v. United States*, 395 A.2d 796, 804 n. 18 (1978); *Smith v. United States*, 123 U.S.App.D.C. 202, 203–04, 358 F.2d 833, 834–35 (1966). In cases such as this where probable cause for arrest is predicated in part on the personal observations of the arresting officer, the court may not rely on facts which were available to other officers at the scene unless that information was *communicated to the arresting officer*. *Id.* There is no evidence of communication here.[8]

On this record, therefore, which may signal "an indifferent presentation of evidence in a suppression hearing," *Rushing v. United States*, 381 A.2d 252, 258 (D.C. 1977) (Gallagher, J., dissenting), we cannot say that the arresting officer witnessed conduct on the part of appellant which would place him beyond the protection of *Smith*.

*Reversed.*

BELSON, Associate Judge, dissenting:

The majority overturns the trial court's denial of appellant Haywood's motion to suppress on two bases: 1) that the police lacked probable cause to arrest appellant without a warrant and, alternatively, 2) that the government's evidence did not prove that observations made personally by the particular officer who arrested Haywood gave the officer probable cause to do so.

With respect to probable cause for arrest, the majority holds that this court's recent 5 to 4 en banc decision in *Smith v. United States*, 558 A.2d 312 (D.C.1989) compels reversal here. Recognizing that this court is bound by *Smith*, I point out that there are important distinctions between the grounds for a *Terry*[1] stop disapproved by the court in *Smith*, and the grounds for probable cause presented by the facts in this case.[2]

---

8. The sanctioning of an "inference" that an officer arresting a man on the street without a warrant had knowledge of facts that would justify the arrest, would, (carried to the extreme) eliminate the need for a probable cause hearing. Our dissenting colleague's reliance on *Illinois v. Andreas*, 463 U.S. 765, 771 n. 5, 103 S.Ct. 3319, 3324 n. 5, 77 L.Ed.2d 1003 (1983), is misplaced. The "presumption of knowledge" there was so obvious as to be a fact. There would be no question that Drug Enforcement Agents, posing as delivery men, knew that the container that they brought to respondent's residence (a container which they had previously lawfully entered at the airport) contained a controlled substance. The Supreme Court, in ruling that no warrant was required to reopen the container after respondent's arrest, noted that it was plain error for the Illinois court to hold that one agent's absence at the time the container had been resealed somehow made less than certain his knowledge of the contents.

1. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

2. Although *Smith* involved a *Terry* stop rather than an arrest based on probable cause, the facts before us here satisfy the test for either action by law enforcement officials. The facts here afforded more than a particularized and objective basis for suspecting [appellant] of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981); the circumstances were that " 'a reasonably prudent police officer, considering the total circumstances confronting him and drawing from his experience,' would be warranted in the belief that an offense has been or is being committed." *Peterkin v. United States*, 281 A.2d 567, 568 (D.C.1971), *cert. denied*, 406 U.S. 922, 92 S.Ct. 1788, 32 L.Ed.2d 122 (1972) (quoting *Lucas v. United States*, 256 A.2d 574, 575 (D.C.1969)).

It is true, of course, that there is a basic similarity between the fact patterns of the two cases. In each case, an unmarked police car proceeded to the intersection of 12th and U Streets, N.W. in response to a communication from another law enforcement officer describing yet another episode of narcotics trafficking activity at that drug-beleaguered location. But there are at least two important factual distinctions that gave the police a stronger basis for action in this case than they had in *Smith*. The first is that here the police observed more than a mere conversation between appellant Haywood and Tate, the narcotics dealer described in the police tip. Sergeant Miller testified that he personally saw Haywood give money to Tate before the officers got out of their car to detain appellant and Tate. The majority opinion in *Smith* relied in part on the fact that the officers involved in that case did not see Smith handle money or make any other movement or gesture that might have indicated that he played the role of the "money man" on a drug-dealing team. *Smith, supra,* 558 A.2d at 315.

Second, while the majority in *Smith* declined to attribute to Smith any knowledge or belief on Smith's part that the approaching police officers were indeed police officers, it is noteworthy that Smith was not the person who had been identified as dealing in drugs in the information the arresting officers had received. In contrast, in this case Tate was identified in the tip as being a narcotics trafficker. That gave added significance to the fact that, as the officers here approached and saw Haywood handing money to Tate, Tate saw them, and the two men then pulled their hands away, Haywood "pushed off" from Tate, the two did an about face, and they walked away in opposite directions. It is quite reasonable to believe that a person reported to be engaged in drug trafficking at the notorious 12th and U intersection (where

the witness Sergeant Miller himself had made over 20 drug arrests) would be on the lookout for approaching police officers, and reasonably savvy at recognizing them. Remarkably, the majority here asserts that "on this record we cannot even infer that Tate knew that the unmarked car was a police cruiser." The majority finds itself unwilling to acknowledge what the defense counsel himself freely conceded in this case during a colloquy concerning the arrival of the police at 12th and U, *i.e.,* that unmarked cars such as the police used in this case do not deceive criminals, such as those who deal drugs in such drug-stricken locations as 12th and U, N.W.[3]

The trial judge was undoubtedly correct when, in ruling at the conclusion of the hearing that there was probable cause to believe that appellant was engaged in a drug transaction, she said:

> in a high narcotic area when one gives money to a person who is identified as a drug dealer and then when the police arrive walks away, I do not think it's at all unreasonable to believe the totality, the totality of circumstances in that instance gives them probable cause to believe that someone has done something and committed a crime.

The totality of the circumstances at the time of the arrest combined with the information included in the tip received by the "jump out squad" included the following: that a man matching Tate's description was selling narcotics near this particular trash barrel according to the informant; that upon their arrival at an intersection notorious for drug trafficking the police saw Tate near the trash barrel; that the testifying officer saw Haywood hand over money in the form of bills to Tate; that as the police approached, the men pulled *their* hands away and there was a "push off" between Tate and Haywood who then, significantly,[4] walked away in opposite di-

---

3. In her findings, the trial judge stated:

   In addition to that, when they got out of the cruiser, which I think we all agreed that this unmarked cruisers are just as visible to persons in *those areas as they are, I mean they* are obviously police cars. I don't think any-

one really, very few people would not recognize it as such.

The judge's language indicates that she accepted counsel's concession of the well-known.

4. *See United States v. Bennett,* 514 A.2d 414, 416 (D.C.1986).

rections; and that the "push off" occurred just after Tate, described as a narcotics dealer, noted the arrival of the police officers.

To the detriment of law enforcement and to the detriment of the community, including the drug-plagued neighborhood around 12th and U Streets, N.W., the majority has chosen to enter a holding that will make it more difficult for the police to arrest drug traffickers when the circumstances justify a reasonable belief that they are peddling drugs on the streets of Washington. The majority interprets the Constitution in a way that makes unduly burdensome the showing of probable cause required to support an arrest for narcotics trafficking.

Turning to the majority's alternative ground for reversal, I think the majority errs in stating that a reversal is warranted on the ground that the government did not present any evidence regarding the personal knowledge and observations of the arresting officer that allegedly gave him probable cause to arrest appellant. The majority bases this conclusion primarily on the fact that the only witness at the suppression hearing, Sergeant Charles E. Miller, was the officer who arrested Tate, whereas a different officer, Robert Franck, arrested appellant Haywood. This fact, however, does not undermine the basis upon which Officer Franck arrested appellant. Both of those law enforcement officers were members of a squad that was responding as a unit to the scene of the arrest to pursue a tip conveyed to the squad by another officer, Officer Romano. Sergeant Miller received a communication from Officer Romano that the "source" had observed a described individual (Mr. Tate) distributing narcotics at the location in question. Sergeant Miller then proceeded to the intersection of 12th and U in an unmarked police car with three other officers including Officer Franck. Upon arriving there Sergeant Miller saw appellant Haywood handing the money to Mr. Tate. The officers then "proceeded to where the two gentlemen were standing and every-

body got out of the car." The inference that must be drawn, I submit, is that all the members of the squad were aware of the purpose for which they went to the intersection of 12th and U and shared the information about the exchange of money before they got out of the car to stop appellant and Tate.[5]

Finally, with respect to the reliability of the informer, it appears that the record does not indicate whether Officer Romano knew of the reliability of the informer before, or only after, he transmitted the tip to the arresting officers. Under the circumstances, it is not even necessary to rely, as one reasonably can, on the inference that members of the Metropolitan Police Department were necessarily aware of their source's successful track record before Romano transmitted the information to the jump out squad. Such reliance is unnecessary because, as matters developed at the scene of the arrest, the tip was verified when the police saw a person precisely matching the distinctive description of Tate standing near the notorious 12th & U fire barrel and receiving money from appellant. *Waldron v. United States,* 370 A.2d 1372, 1373 (D.C.1977) (sufficiently detailed tip may "verify itself"); *Mitchell v. United States,* 368 A.2d 514, 518–19 (D.C.1977) (Kern, J. concurring) (even if one assumes that detailed tip did not "verify itself," initial on-the-scene police investigation before arrest can corroborate tip to the extent that it was reasonable to conclude that informant was telling the truth); *cf. Illinois v. Gates,* 462 U.S. 213, 243–45, 103 S.Ct. 2317, 2334–36, 76 L.Ed.2d 527 (1983) (corroborating police investigation can provide basis for crediting anonymous tip).

For the foregoing reasons, I would affirm.

---

**5.** *See Illinois v. Andreas,* 463 U.S. 765, 771–72 n. 5, 103 S.Ct. 3319, 3324 n. 5, 77 L.Ed.2d 1003 (1983) ("where law enforcement authorities are cooperating in an investigation, ... the knowledge of one is presumed shared by all.").