UNITED STATES of America

v.

**Larue H. PURRY, Appellant.**

**No. 75–1339.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 5, 1976.

Decided Nov. 12, 1976.

James T. Kilbreth, III,* with whom Steven H. Brose, Washington, D. C. (appointed by this court), was on the brief for appellant.

Jordan A. Luke, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, William D. Pease and James F. Rutherford, Asst. U. S. Attys., Washington, D. C., were on the brief for appellee. John W. Polk, Asst. U. S. Atty., Washington, D. C., also entered an appearance for appellee.

Before LEVENTHAL, ROBINSON and ROBB, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROBB.

ROBB, Circuit Judge:

After a trial by jury the defendant Purry was convicted of armed bank robbery, 18 U.S.C. § 2113(a), (d), possession of an unregistered shotgun, 26 U.S.C. § 5861, and carrying a dangerous weapon, 22 D.C.Code § 3204. On this appeal he contends that the District Court erred in overruling (1) his motion to suppress testimony that he was identified in a "showup" at the scene of the robbery thirty minutes after the event, and (2) his motion to suppress as evidence a shirt taken from him at the time of his arrest.

At approximately 12:00 o'clock noon on August 29, 1974 three masked men entered the lobby of the branch banking office of the Union Trust Company at the corner of Connecticut Avenue and N Street, N. W. in Washington. Two of the men jumped over the counter and went into the tellers' cages. The third man, described by witnesses as tall and slender and wearing a navy blue printed shirt with a distinctive red pattern or print, and jeans, and holding a rifle or shotgun, stood to one side. He ordered the bank personnel and customers to lie on the floor. One witness testified that when he "yelled something" he pulled his mask up to the bridge of his nose. After approximately three minutes in the bank the robbers ran out, taking more than $10,000 of the bank's money. As they left they took off their masks.

Included in the money taken from the bank were three packages composed of tear gas and red dye bombs disguised as sheafs of currency. When these packages were removed from a cash drawer an explosive device was electronically activated and timed to explode several minutes later.

When the robbers left the bank witnesses saw them run to an automobile parked nearby on N Street. At the car the tall robber dropped a black bag from which red smoke issued. The men got into the car and sped west on N Street. Then the bogus currency exploded, filling the car with red smoke, and the men abandoned it at the intersection of 20th and N Streets, about two blocks from the bank.[1]

Metropolitan Police Officer Robert D. Swygert and his partner, Officer Mary V. Foos, cruising in a marked police car in the vicinity of the bank, heard of the holdup when they monitored a "robbery in progress" broadcast on the police radio. They went to the bank, where they were informed that the robbers, three or four in number, had left in an automobile. The officers were instructed to "cruise the area". Shortly thereafter, at about 12:15 P.M., the officers heard on the radio that the robbers had abandoned their car near 20th and L Streets. The cruiser was then

---

* Entered an appearance as Student Counsel pursuant to Rule 20 of the General Rules of this Court.

1. The police found Purry's wallet in the car.

at 21st Street and Massachusetts Avenue, about three blocks from 20th and L Streets. At this time Swygert saw Purry, on foot and heading away from 20th and L Streets. Purry was walking fast, perspiring profusely, and Swygert thought he looked excited and as though he might have just been running. There was something that looked like fresh dirt on Purry's right pants leg. Swygert stopped Purry and asked him for identification. Purry said he had none with him. Swygert told him there had been a bank robbery in the area and he was going to take Purry "back to the bank to have a showup in front of the bank." Swygert testified:

A. Mr. Purry informed me, if I remember correctly, that he knew nothing of the bank robbery or something to that effect.

Q. Did you get any more communication on the radio at this time?

A. I an sure there was, but at this time I was standing outside the cruiser by the right rear fender.

Q. What happened next?

A. Well, I placed my arm on Mr. Purry and he then turned and pulled away and a Second District plainclothes officer came up and the two of us handcuffed Mr. Purry and were about to place him in a patrol wagon and take him back to the bank.

Q. Then what happened?

A. On or about this time, my partner, Mary Foos, who had been in the cruiser, she was taking a lookout, from what I understand, and she, in turn, gave the lookout to me.

Q. Was there any conversation between you and Mary Foos about the lookout?

A. Yes, sir. She related to me one of the subjects was approximately six foot tall, medium complexioned, a bluish-reddish shirt on with jeans, dark jeans.

Q. So then did you take the defendant back to the bank?

A. That is correct, I believe he went in wagon 23. We took him back to the bank.

Purry is approximately six feet tall, of medium complexion and was wearing a "bluish-reddish shirt" with dark jeans. In other words the broadcast description, communicated to Swygert just after Purry was handcuffed, fitted him. This description had been obtained by the police from witnesses to the holdup, all of whom had focused on the tall robber wearing a blue printed shirt and jeans.

Pressed on cross examination to explain his decision to take Purry back to the bank Officer Swygert testified that in addition to the objective facts which he observed

I have been on the Metropolitan Police Department for four and half years and this is not the first time I have arrested anyone for an offense such as this.

And I guess that, along with my own intuition, just led me to believe that he was a subject that should have been taken back to the bank.

Q. Have you ever arrested anyone that was not identified or involved in an incident such as this, since you are making a comparison?

A. Are you speaking of armed robbery?

Q. Yes.

A. No, sir; I have not, Everyone I have arrested has been wanted in this particular offense.

Specifically, there has been about five cases.

Taken to the bank in a patrol wagon Purry was there identified by eight witnesses as one of the robbers.

Purry's shirt was taken from him and was identified by witnesses at trial as the shirt worn by the tall slender robber. As we have indicated Purry moved to suppress this shirt, together with the evidence of the identifications at the bank, but his motion was overruled.

### THE ARREST

Counsel for Purry argues that his motion to suppress should have been granted on the ground that Purry was arrested without probable cause. We disagree.

Analysis of the events at 21st Street and Massachusetts Avenue must start from the premise that Officer Swygert lawfully stopped and questioned Purry. Swygert knew that moments before the robbers had abandoned their car only three blocks from the Massachusetts Avenue intersection. He saw Purry walking rapidly, sweating profusely, looking excited and as though he might have been running. There appeared to be dirt on Purry's leg, suggesting that he might have fallen. The officer evaluated these facts in light of his experience as a policeman for four and one-half years, during which he had arrested five other armed robbery suspects without a mistake. The combination of these facts plainly justified the officer in stopping Purry to determine his identity and to question him. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *United States v. Hines,* 147 U.S.App.D.C. 249, 455 F.2d 1317, *cert. denied,* 406 U.S. 975, 92 S.Ct. 2427, 32 L.Ed.2d 675 (1972); *United States v. Davis,* 147 U.S.App.D.C. 400, 402–03, 458 F.2d 819, 821–22 (1972).

Having lawfully stopped Purry Officer Swygert was entitled "to maintain the status quo momentarily while obtaining more information", *Adams v. Williams, supra* at 146, 92 S.Ct. at 1923, and in maintaining the status quo he was entitled to use reasonable force. We think the handcuffing of Purry was reasonable, as a corollary of the lawful stop. *See Terry v. Ohio, supra,* 392 U.S. at 27, 28, 88 S.Ct. 1868. Given Swygert's suspicions he was entitled to obtain more information about Purry's possible implication in the holdup; and when Purry attempted to frustrate further inquiry Swygert was not required to shrug his shoulders and allow the suspected criminal to walk away. *Adams v. Williams, supra* at 145, 92 S.Ct. 1921. The handcuffing was an appropriate method of maintaining the status quo while further inquiry was made.

While Swygert was in the act of handcuffing Purry additional information was forthcoming by way of the lookout received by Officer Foos and communicated to Swygert. Only then was Purry removed to the bank. Whatever may have been the previous situation the lookout conclusively established probable cause for Purry's arrest and justified his transportation back to the scene of the holdup. Had Swygert been questioning Purry at the moment when the broadcast was received and communicated to Swygert, and had this occurred before the handcuffing, we take it that no one would question the validity of the arrest and removal that followed. We think they were not invalid because Purry was forcibly detained, to maintain the status quo, for a few moments before Swygert learned of the lookout.

Even if Swygert had released Purry it would have been the duty of his partner, Officer Foos, to make the arrest immediately upon receiving the lookout and before Purry escaped. It appears therefore that the question of the existence of probable cause in the mind of Officer Swygert when he handcuffed Purry is more academic than realistic. Given the lookout heard by Officer Foos, the handcuffing by Swygert and the momentary interlude thereafter before the lookout was communicated to Swygert were not the critical factors underpinning Purry's presence in the showup at the bank—they were not a "poisonous tree" from which the showup stemmed. When Purry was taken back to the bank he was validly under arrest on the basis of probable cause.

## THE ON–THE–SCENE IDENTIFICATIONS

The appellant contends that the identification procedures at the bank were unduly suggestive and the identifications "thoroughly unreliable". We do not agree.

As we have said, in confrontations at the bank eight witnesses identified Purry as one of the robbers. Four of these witnesses were citizens who had seen the robbers leaving the bank, after removing their masks; the others were customers or tellers who had been in the bank during the holdup.

The identification procedure at the bank was that Purry and two or three other suspects were placed in a group in the vestibule between the glass double doors of the bank. The witnesses, who were kept inside the bank, were brought one by one to the inside door and asked whether they could identify anyone in the showup. There was no communication between the witnesses and the police made no suggestive remarks. Purry and the other suspects in the showup were handcuffed but had their hands behind their backs. The only exception to this procedure occurred in the case of two witnesses who identified Purry outside the bank when he was returned in a patrol wagon. All the identifications took place within thirty minutes of the holdup.

One of the witnesses who identified Purry at the bank had confronted him face to face as he came out the door. As he later testified he "happened to be right in front of the bank, and three men came out. We didn't collide, but it startled me, and I stopped, and they stopped." Another witness saw the men running past, a few feet from him, and called out to one man "What is going on?" to which the man replied "What does it look like?" A third witness was entering the bank when he saw there was a holdup in progress. He waited outside for the robbers to come out "thinking they would take the masks off when they left the bank." The men did emerge without their masks and passed within ten feet of the witness. He focused on the tall robber, thinking it would be "easier" if he tried to "identify the one rather than try to identify many." A fourth witness watched from across the street as two of the robbers got into their car on N Street. He noticed that one wore a dark printed shirt and the other a light blue shirt. He saw the car fill with red smoke and then followed it to where it was abandoned. Other witnesses, customers or tellers who had been in the bank during the holdup, also identified Purry. One customer focused on the tall slender robber wearing a navy blue printed shirt and jeans. A teller noted that the tall robber wore a reddish shirt and had lifted his mask up to the bridge of his nose. An-other customer saw the three robbers standing in the doorway and putting on their masks. She also noted the tall slender man in the dark printed shirt and blue jeans.

Counsel contends that what he calls the "lineup" at the bank was unduly suggestive, unreliable and deprived Purry of due process. The district judge held otherwise and we think he was right. In the first place the confrontation at the bank was not a formal lineup, but was a showup on the scene of the crime within minutes of the robbery. Such a confrontation is not to be judged by the standards applied to a formal police lineup. That Purry was the tallest man shown to the witnesses might have flawed a formal lineup, but it was not a fatal defect in a quick, on-the-scene showup.

The police were careful to make the showup as fair as possible. Purry was presented to the witnesses in a group of several men. The witnesses were brought forward one by one, and without suggestions from the police were asked whether they could identify any one. There was no consultation between the witnesses concerning their identifications. At least four of the witnesses had seen the robbers at close range, unmasked, in bright daylight. There was no substantial likelihood of misidentification. Counsel argues that the witnesses did not identify Purry's face, but identification by build, height and clothing is not necessarily unreliable, especially when a witness identifies someone he has seen in broad daylight only a few minutes before.

We think further discussion of the identifications is unnecessary. They fully complied with the standards of *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Russell v. United States,* 133 U.S. App.D.C. 77, 408 F.2d 1280, *cert. denied,* 395 U.S. 928, 89 S.Ct. 1786, 23 L.Ed.2d 245 (1969); *United States v. Hines, supra;* and *United States v. Canty,* 152 U.S.App.D.C. 103, 113, 469 F.2d 114, 124 (1972). Although the appellant was of course free to argue the weight of the identification evidence it was plainly admissible.

*The judgment is affirmed.*