638 A.2d 1123 (1993)
In re M.E.B., Appellant.
No. 90-FS-1602.
District of Columbia Court of Appeals.
Argued November 4, 1992.
Decided February 23, 1993.
Rehearing Denied April 27, 1994.
Robert Wilkins, Public Defender Service, with whom James Klein, Public Defender Service, Washington, DC, was on the brief, for appellant.
Mary Wilson, Asst. Corp. Counsel, with whom John Payton, Corp. Counsel, and *1124 Charles L. Reischel, Deputy Corp. Counsel, Washington, DC, were on the brief, for appellee.
Before FERREN, SCHWELB and KING, Associate Judges.
KING, Associate Judge:
Appellant, who was sixteen years of age at the time of the offense, was found guilty of second-degree murder based largely upon his confession. On appeal he claims that the confession should have been suppressed because it was tainted by the illegal arrest that preceded it. We conclude that the confession was properly admitted by the trial judge. Accordingly, we affirm.

I.
On May 31, 1990, Lloyd Copeland was shot twice at the doorway of a laundromat in the 4400 block of South Capitol Street, at approximately 2:35 p.m. He was pronounced dead shortly afterward. A carry-out is located next to the laundromat, and the Elmira Street corner-store is located next to the laundromat.
Significant events and radio communications applicable to the issues raised in this appeal are set forth chronologically below:

2:35 p.m. Lloyd Copeland shot.
2:41 p.m. Police on scene broadcast a lookout for a black male in a black jacket
 and black shorts or a black jean outfit, heading in direction of South
 Capitol Street.
2:47-2:48 p.m. Police on scene called dispatcher to advise that suspect was a black
 male, 17-18 years old, wearing a blue or black jean outfit with shorts.
2:49 p.m. Updated lookout for black male, 17-18 years old, 5'8", slim build, dark
 complected, "Philly" style haircut, wearing black Guess brand jacket
 with matching black shorts, white T-shirt, black Reebok shoes, last
 seen running on South Capitol Street toward Forrester [Street].
3:07 p.m. Dispatcher requested police unit to investigate call at 138 Joliet Street,
 S.W., that shooting suspect had been seen on Joliet Street wearing
 Guess jeans and a Bart Simpson T-shirt.
3:09 p.m. Dispatcher repeated the previous description of alleged shooter "said to
 be standing with" another male wearing a black and white T-shirt.
3:11 p.m. Essentially the same transmission as at 3:09 p.m.

Homicide Detective Pamela Reed was driving to the murder scene when she heard the 3:07 broadcast about a second-sighting. She proceeded to the address given, where she interviewed Tracy Harris. Harris told Detective Reed that she had been inside the carry-out when she heard shots. She went to the door and saw A., then a fourteen year-old juvenile, whom she knew, next to the decedent. She saw no one else. She could not see a gun, but concluded that A. was the person who had fired the shots. A., who was then wearing a black jacket and black shorts, departed from the scene. Harris also informed Detective Reed that she saw A. 15-30 minutes later on Joliet Street, approximately 2-3 blocks from the shooting scene, in the company of another male who was wearing blue jeans and a black and white shirt. A. was now wearing a Bart Simpson T-shirt. Harris confronted A. about the murder, but he denied shooting the decedent. In addition, Harris told Detective Reed that she had seen both A. and the person who was with him on Joliet Street, before the shooting occurred, inside of the Elmira corner-store, two doors from the shooting scene.

3:15-3:18 Detective Reed informed the dispatcher of the information she had
 received from Harris and the dispatcher re-broadcast that information.
 Specifically, the dispatcher identified the subject by name as A., that he
 was wearing blue Guess baggy jeans, with blue boxer shorts visible
 underneath. Detective Reed also informed the dispatcher, who then
 broadcast, that A. was walking with someone slightly shorter wearing a
 black and white striped shirt.

*1125
3:23 p.m. An officer in the field requested the dispatcher to repeat the lookout.
3:24 p.m. Dispatcher stated "subjects are said to be wanted for questioning in
 reference to the shooting." The dispatcher stated "subject one" was
 named "A." and then repeated A.'s description, and that A. was "in the
 company of" another black male wearing a black and white striped
 shirt.

After interviewing Harris and calling the dispatcher, Detective Reed went to the scene of the shooting, where she interviewed other witnesses. It was then she learned that immediately before the shooting the decedent and two other young males had been engaged in an argument inside the laundromat. One witness informed Detective Reed that the gunman was one of the two males who had argued with decedent.

3:47 p.m. An officer in the field called and asked for a repeat of the descriptions,
 which the dispatcher provided. The field officer then responded that
 "they" had both subjects, and would transport them to the crime scene.

At 3:50 p.m., Officer Pierce and Officer Strong took A. and appellant (who was wearing a black and white shirt) into custody at Fifth Street and Mississippi Street, S.E. The two were told that they were not under arrest. They were both handcuffed and then transported to the crime scene 10-15 blocks away. They remained at the crime scene for 5-10 minutes, and then were directed to go to a location on Galveston Street, a trip which took another 2-3 minutes, where Harris identified both A. and appellant as the two she had seen earlier. Before the identification procedures were conducted, however, A. informed Detective Reed that appellant was the shooter. Thereafter, appellant was placed under arrest and transported to the homicide division office where he confessed that he had shot the decedent.
In his confession, appellant told the police that he and his friend A. were inside the Elmira corner-store when a man with a swollen lip exchanged words with A. Appellant and A. then left the store and walked to the laundromat to play video games. The man with the swollen lip and the decedent entered the laundromat and confronted A. The decedent made a threatening remark, which appellant understood to be directed both to himself and to A. Appellant and A. left the laundromat, and appellant went to retrieve a gun he had hidden nearby. Thereafter, he returned to the laundromat, where he shot the decedent twice. At the time of the shooting, A. was standing across the street.[1] Appellant and A. then went to A.'s home where they both changed clothes. Shortly afterward, the two encountered Harris on Joliet Street. Still later, he and A. were taken into custody.
Before trial, appellant moved to suppress the confession, claiming that it was: (1) the product of an illegal arrest, (2) taken in violation of his rights as guaranteed by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and (3) not voluntary. The trial judge denied the motion, and appellant was subsequently found guilty, with the confession being the principal evidence presented against him. At trial, appellant repudiated his confession, and testified that A., not he, had shot the decedent. This appeal followed.

II.
Appellant makes a multi-pronged attack upon the actions of the police that led to the taking of his confession after his formal arrest. Appellant does not contest the propriety of the police conduct with respect to the actual taking of the confession, nor does he *1126 now contend that the confession was not voluntary. His sole claim in this appeal is that his Fourth Amendment rights were violated, and that the confession must be suppressed because it was the direct result of, and therefore tainted by, the alleged Fourth Amendment violations. Dunaway v. New York, 442 U.S. 200, 216-19, 99 S.Ct. 2248, 2258-60, 60 L.Ed.2d 824 (1979); Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).
The claimed Fourth Amendment violations are based on several alternative grounds, any one of which would be dispositive in appellant's favor. Specifically, appellant contends: (1) the restraints to which he was subjected, between the time he was stopped on the street through the time of the identification, constituted an arrest, which can be supported only by a showing of probable cause (which was concededly lacking); (2) that none of the information received by Detective Reed after the broadcast initiated by her may be used in determining whether the information available rose to the level of reasonable suspicion; (3) that even if the information received by Detective Reed after the initial broadcast is considered, the police did not possess sufficient information to support a Terry detention on the grounds of reasonable suspicion; and (4) even after appellant and A. were identified, and appellant had been implicated by A. as the shooter, probable cause to arrest was lacking.

III.
Appellant was taken into custody, along with A., by Officers Pierce and Strong at 3:50 p.m.one hour and fifteen minutes after the murder. Appellant argues that, at that point, he was subjected to a full custody seizure of the person which constituted an arrest, as opposed to a detention for investigative purposes, which can be justified only if the officers had probable cause to believe he had committed an offense. He maintains that the police did not, at that point, have sufficient information to establish probable cause. The government does not claim to the contrary, and we do not conclude otherwise. We reject, however, appellant's contention that his detention amounted to an arrest which would have required a showing of probable cause.
The government argues that, at the time appellant was taken into custody, there were reasonable grounds for an investigative stop and detention under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). We will examine the question whether there were sufficient facts available to support a Terry stop in Part V. of this opinion, infra. The question presented here, however, is whether the police conduct, in handcuffing appellant, placing him in the rear of the police vehicle, and driving him from the point where he was stopped on the street to other locations for identification purposes, converted the Terry stop into an arrest requiring probable cause. As noted, the government concedes, and we agree, that there was insufficient evidence, at the time appellant was stopped, to establish probable cause. Thus, if the seizure of M.E.B. went beyond an investigative stop and amounted to an arrest, then the police conduct was unlawful. We conclude that it did not.
Before we address this point, we find it helpful to consider the differences between the purpose for an arrest on one hand, and a Terry stop on the other. Generally, an arrest is effected when the police have made a determination to charge the suspect with a criminal offense and custody is maintained to permit the arrestee to be formally charged and brought before the court. See generally Hayes v. Florida, 470 U.S. 811, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985); Taylor v. Alabama, 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982). A Terry seizure, on the other hand, involves a more temporary detention, designed to last only until a preliminary investigation either generates probable cause or results in the release of the suspect. See United States v. Purry, 178 U.S.App.D.C. 139, 545 F.2d 217 (1976). There is no evidence that the officers meant to formally charge A. and appellant when they put them into the police vehicle. In fact, although this is not controlling, A. and appellant were specifically told they *1127 were not under arrest.[2]See United States v. Gayden, 492 A.2d 868 (D.C.1985), cert. denied, ___ U.S. ___, 112 S.Ct. 137, 116 L.Ed.2d 104 (1991). Here the two detainees were only wanted "for questioning," a phrase incompatible with an intent to arrest.
We have held that Terry permits the police to transport a suspect, especially one thought to be involved in a serious felony, from the place of apprehension to another location for identification purposes. See In re M.M., 407 A.2d 698, 701 (D.C.1979). The trial court found that between 12 and 17 minutes elapsed between the initial stop and the identification. Relying on M.M., the trial court concluded that since it was necessary to transport appellant approximately 14-19 blocks to two separate locations, the passage of time did not convert the detention to an arrest.
The measure of the scope of permissible police action in any investigative stop depends on whether the police conduct was reasonable under the circumstances. United States v. Sharpe, 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985). Here, the police first transported appellant to the scene of the shooting, a trip that took 4 to 5 minutes. Had the identification procedures occurred then, it would be clear that M.M. would be controlling, and that no arrest would be considered to have occurred. Upon arriving at that location, however, it took the officers between 5 and 10 minutes to learn that the prospective identification witnesses were somewhere else. It then took 2 to 3 minutes to reach the second location, where the identification procedures promptly took place. The trial judge found that, under the circumstances, the delays were reasonable. Citing M.M., Judge Holder concluded that the police conduct, in so transporting appellant, did not convert the custody status of appellant from a "detention for investigation" to a "formal arrest." We find no basis for concluding otherwise.
Nor do we believe that the handcuffing of appellant during the period he was in the scout car, under these circumstances, changed the character of his custody. Although we have never addressed the question of whether handcuffing a detainee converts a Terry detention to an arrest, we have observed that the "protection of the officer making the stop ... is of paramount importance. It has been called the rationale of Terry." United States v. Mason, 450 A.2d 464, 466 (D.C.1982) (citations omitted); see Peay v. United States, 597 A.2d 1318, 1322-23 (D.C.1991) (en banc) (personal safety of officer is relevant consideration in Terry encounters). Here, for reasons to be discussed in Part V., the police had reasonable grounds to suspect that appellant and his companion were involved in a murder that had occurred just over an hour earlier. It appears to be undisputed that the police followed their usual practice and frisked[3] both appellant and A. before they were handcuffed. Officer Pierce testified that he told both A. and appellant that they were not under arrest. They were then placed in the car to be transported.
The cases uniformly hold that the officers' safety is a significant factor to be weighed in determining whether the restraint chosen by the officers converts the stop to an arrest. Here the two detainees were suspected of possible involvement in a murder, and they were to be transported, in the back of a patrol car, for a dozen or more blocks. We cannot say that the additional restraint caused by the handcuffing was such an intrusion that the handcuffing transformed the character of the restraint to an arrest. We have assumed that the two were frisked, but even a frisk does not ensure that weapons *1128 will be discovered. See Nelson v. United States, 601 A.2d 582, 587 (D.C.1991) (pat down by arresting officer discovered no weapon; full search by transporting officer discovered a knife in arrestee's pocket); Lewis v. United States, 399 A.2d 559, 560 (D.C.1979) (frisk by first officer produced no weapon; frisk by second officer resulted in recovery of pistol); see also Smith v. United States, 435 A.2d 1066, 1067-68 (D.C.1981) (frisk of defendant recovered no weapon; after transport in vehicle, pistol holster recovered from seat where arrestee had been sitting), cert. denied, 455 U.S. 950, 102 S.Ct. 1454, 71 L.Ed.2d 665 (1982). We are satisfied, therefore, that there was a significant basis in this record for the trial court to conclude the handcuffing was a reasonable precaution under the circumstances. See also United States v. Purry, supra, 178 U.S.App.D.C. at 142, 545 F.2d at 220 ("the handcuffing of [defendant] was reasonable, as a corollary of the lawful [Terry] stop," in order to maintain the status quo while the officer sought more information).
We note also that other courts have "generally upheld the use of handcuffs in the context of a Terry stop where it was reasonably necessary to protect the officers' safety or to thwart a suspect's attempt to flee." Reynolds v. State, 592 So.2d 1082, 1084 (Fla. 1992); accord United States v. Crittendon, 883 F.2d 326, 329 (4th Cir.1989); People v. Allen, 73 N.Y.2d 378, 540 N.Y.S.2d 971, 972, 538 N.E.2d 323, 324 (1989); State v. Wheeler, 108 Wash.2d 230, 737 P.2d 1005, 1008 (1987) (en banc); Howard v. State, 664 P.2d 603, 609 (Alaska Ct.App.1983). In short, handcuffing the detainee, like length of detention, place of detention, and other considerations, is simply one factor, among many, that the trial judge must consider in weighing whether a detention for investigation crossed the line into the realm of arrest. We are satisfied that Judge Holder properly weighed those factors in ruling that the line had not been crossed, and that no arrest had taken place until after the identification procedures were completed, and A. had implicated appellant. We find no basis for disturbing that conclusion by the trial judge.

IV.
Before examining whether the information known to the police was sufficient to establish reasonable suspicion, we must determine whether the information obtained by Detective Reed, after she initiated her first broadcast, may be considered in assessing the adequacy of the basis for a Terry stop and detention. Appellant contends that it may not be considered, because a later broadcast, taking into account the new information, was not communicated to the officers who stopped A. and appellant on the street. See People v. Beard, 35 Ill.App.3d 725, 342 N.E.2d 343, 348 (1976); People v. Ford, 150 Cal.App.3d 687, 198 Cal.Rptr. 80, 86 (1984). Specifically, appellant argues that the information learned by Detective Reed after her broadcast, namely that two people, one of whom might reasonably have been appellant, were arguing with decedent inside the laundromat just before the decedent was shot by A. at the door of the laundromat, may not be considered when determining whether there were adequate grounds for the stop. The government conceded in its brief that, until Detective Reed received that final piece of information, sufficient grounds for a Terry stop were lacking.[4] For this analysis, we assume, without deciding, that the concession is well-founded. Thus, if the after-acquired information, relating to M.E.B.'s presence during the argument in the laundromat, cannot be considered in the calculus, then the so-called Terry stop was unlawful.
Appellant argues that the exclusionary rule is designed, inter alia, to ensure that police will not broadcast lookouts to pick-up individuals unless there is a sufficient legal basis for doing so. The government does not dispute (assuming the concession discussed earlier), that had appellant been stopped before *1129 Detective Reed learned the additional information, the stop would have been unlawful. But this is not what happened. Detective Reed did obtain additional information which, together with what was already known, was sufficient, as we hold in Part V., to justify a Terry stop. Appellant contends, however, that Detective Reed was obligated to initiate a new broadcast once she received the new information. Appellant does not claim that the new information needed to be included in any such broadcast. He maintains only that a new broadcast was required, even one identical in language to the previous (defective) broadcast, as a means of showing that the new information had been fed into the calculus.
The trial court concluded, based on her testimony on this point, that Detective Reed made a conscious determination that any new broadcast would provide no more additional useful information to the officers on the street than had already been provided in her initial broadcast. In short, Detective Reed knew what had been broadcast previously, and the new information confirmed, in her mind, the validity of the previously transmitted lookout. Although not so articulated by Detective Reed, any new broadcast would have been superfluous. We agree with the trial judge and reject, as insufficiently grounded in reality, the notion that in order to provide an adequate factual basis for the Terry stop and detention, Detective Reed was required to engage in a exercise in futility by broadcasting the same lookout all over again. See Ohio v. Roberts, 448 U.S. 56, 74, 100 S.Ct. 2531, 2543, 65 L.Ed.2d 597 (1980) ("[t]he law does not require the doing of a futile act"). We fail to see how imposing such a requirement would provide any additional protection to citizens from unlawful police conduct.
Authority on this point is sparse. Ford, supra, relied upon by appellant, was a case involving an arrest. Ford, supra, 198 Cal. Rptr. 80, We note that in analyzing this issue, we do not find any distinction between an arrest and a Terry stopand the parties do not contend otherwise. At bottom, the issue is whether after-acquired information may be considered when assessing police compliance with the requirements of the Fourth Amendment.
In Ford, an intermediate appellate court concluded that "an arrest made upon a directive from an officer or agency without probable cause is not validated by information obtained after the issuance of the directive but before the arrest." Id. 198 Cal. Rptr. at 88. The California courts, however, have not adopted the doctrine that the "collective information" of law enforcement officers working together is sufficient to establish probable cause. Id. 198 Cal.Rptr. at 87. The Ford court, although noting that the cases applying the doctrine were well-considered, expressly declined to adopt such a doctrine and based its decision on its own precedents. Id. The court, therefore, specifically declined to follow the holdings in United States v. Lomas, 706 F.2d 886, 892 (9th Cir. 1983) ("It is sufficient if the pool of objective data possessed by the group of agents acting in concert supplies the requisite probable cause"), cert. denied, 464 U.S. 1047, 104 S.Ct. 720, 79 L.Ed.2d 182 (1984) and United States v. Nieto, 510 F.2d 1118, 1120 (5th Cir.) (probable cause can rest on the collective knowledge of police, rather than solely on the officer making the arrest, when there is some degree of communication between the two), cert. denied, 423 U.S. 854, 96 S.Ct. 101, 46 L.Ed.2d 78 (1975).
The "collective knowledge" doctrine is firmly established in this jurisdiction in a line of cases going back at least thirty years. See United States v. Hawkins, 193 U.S.App.D.C. 366, 367-68 n. 2, 595 F.2d 751, 752-53 n. 2 (1978), cert. denied, 441 U.S. 910, 99 S.Ct. 2005, 60 L.Ed.2d 380 (1979); Smith v. United States, 123 U.S.App.D.C. 202, 204, 358 F.2d 833, 835 (1966), cert. denied, 386 U.S. 1008, 87 S.Ct. 1350, 18 L.Ed.2d 448 (1967); Williams v. United States, 113 U.S.App.D.C. 371, 372, 308 F.2d 326, 327 (1962). Both Williams and Smith are binding precedent pursuant to this court's holding in M.A.P. v. Ryan, 285 A.2d 310, 312 (D.C.1971) (en banc).
The Smith case is particularly instructive. There, a narcotics agent in Baltimore (Lozowicki) received information from an informant in New York that drugs were being *1130 transported, by train, from New York City to Washington, D.C., by two men identified by the informant by name and nickname. Lozowicki then communicated the information he had received from the informant to an agent in the District (Thompson). Although Lozowicki was aware of the past reliability of his informant, he passed none of the reliability information to Thompson. Nor did the informant provide Lozowicki with any information relating to the underlying circumstances which led the informant to believe the alleged couriers actually possessed narcotics. Thus, the information received by Lozowicki from the informant was not, by itself, sufficient to establish probable cause. See Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). It necessarily follows, therefore, that the information provided by Lozowicki to Thompson was also insufficient to establish probable cause. When the two men left the train in the District, Thompson recognized one of them as a local narcotics dealer. The court concluded that although neither Lozowicki's knowledge gained from his informant, nor Thompson's knowledge gained from his own recollection and observations, standing alone, was sufficient to establish probable cause, the information collectively known, even if not communicated by one officer to the other, was sufficient. Smith, supra, 123 U.S.App.D.C. at 204, 358 F.2d at 835. The court observed that
The correct test is whether a warrant if sought could have been obtained by law enforcement agency application which disclosed its corporate information, not whether any one particular officer could have obtained it on what information he individually possessed.
Id.
Applying that test to the facts of this case, the question becomes, what was the "corporate information" available at the time Officers Pierce and Strong effected the stop? The answer is that the "corporate information" available consisted of information provided by the officers who first arrived on the murder scene; information provided to Detective Reed, both before and after the broadcast (but before the Terry stop); and observations made by Officers Pierce and Strong when they found A. and appellant still together, approximately forty minutes after they were last seen by Harris on Joliet Street. And, as we hold in Part V., that information was sufficient to establish the required reasonable suspicion to support a Terry stop and detention.
In a case relying heavily upon Smith, the en banc Texas Court of Criminal Appeals, on facts very similar to those presented in this case, held that, based on the collective knowledge available to the police, there was probable cause to arrest the defendant. See Woodward v. State, 668 S.W.2d 337 (Tex.Ct. App.1982) (en banc), cert. denied, 469 U.S. 1181, 105 S.Ct. 939, 83 L.Ed.2d 952 (1985). Woodward was a suspect in a murder in Austin, Texas, and a lookout for him, which included a description of his car, was transmitted throughout the state in the early morning hours, approximately two hours after the killing. At the time the lookout was issued, probable cause was lacking. The lookout was received in Columbus, Texas, approximately 90 miles from Austin, and then broadcast by radio by a dispatcher in the local sheriff's office. During the course of that broadcast, an officer in the field informed the dispatcher that the car described had just been seen in nearby La Grange, Texas, enroute to Columbus. That information was also broadcast by the dispatcher and, in response, a deputy sheriff, moments later, observed the described car in Columbus. It was stopped and Woodward, the driver, was arrested. The arresting officer then telephoned the Austin Police Department and advised them that he had Woodward in custody in Columbus.
The court held that when the original lookout was broadcast by the Austin police, the information available to them was insufficient to establish probable cause. The court also concluded, however, that once it became known that Woodward was driving, at that hour of the night, away from Austin, on a highway proceeding from that city, at a location 90 miles away, all the facts and circumstances considered together did establish probable cause. Thus, the information about *1131 Woodward's actual whereabouts tipped the balance from no probable cause to a state where probable cause existed. But, the information that tipped the balance was not communicated to the Austin police until after Woodward was arrested. And of course, the actual arresting officer knew nothing of the underlying facts known to the Austin Police Department which prompted the lookout. The only information the arresting officer had from the Austin police was that Woodward was wanted by them. Thus, no single law enforcement entity or person had within its command all of the information necessary to establish probable cause at the time of the arrest. The Woodward court concluded that was not fatal, ruling
[W]hen there has been some cooperation between law enforcement agencies or between members of the same agency, the sum of the information known to the cooperating agencies or officers at the time of an arrest or search by any of the officers involved is to be considered in determining whether there was sufficient probable cause therefor.
Id. at 344 (emphasis added). The court held that collectively there was sufficient information to establish probable cause, and, accordingly, the arrest was held to be valid. In reaching that conclusion, the court relied heavily upon Smith, a case which we have noted is binding precedent for us. See also Moreno-Vallejo v. United States, 414 F.2d 901, 904 (5th Cir.1969), cert. denied, 400 U.S. 841, 91 S.Ct. 82, 27 L.Ed.2d 76 (1970); Wood v. Crouse, 436 F.2d 1077, 1078 (10th Cir.), cert. denied, 402 U.S. 1010, 91 S.Ct. 2193, 29 L.Ed.2d 432 (1971).
In the instant case, Officers Pierce and Strong, of course, did not themselves possess sufficient information to justify a Terry stop. Their own observation that A. and appellant were still together on the street, however, coupled with the information known to Detective Reed, collectively provided the requisite reasonable grounds for the stop. We conclude, therefore, on the authority of Smith and Woodward, that Judge Holder was entitled to consider all of the evidence, as he did, in assessing the validity of the Terry stop. Cf. Buckner v. United States, 615 A.2d 1154, 1156 (D.C.1992) (police may rely on information identifying the location of the place to be searched that is acquired after the search warrant has been obtained).
Appellant claims, however, that Woodward should not be followed by this court because two subsequent cases undercut the holding in that case. See United States v. Hensley, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); Haywood v. United States, 584 A.2d 552 (D.C.1990). Neither case is on point. Hensley holds that the validity of a Terry stop in the field, which is based on a broadcast, lookout, flyer, or bulletin, and which is effected by an officer who knows nothing about the underlying facts that prompted the communication, depends upon the adequacy of the information available to the entity responsible for the communication. Hensley, supra, 469 U.S. at 232, 105 S.Ct. at 682. If the underlying information falls short of articulable suspicion, then the stop is invalid. Id. Haywood makes essentially the same point in dictum. Haywood, supra, 584 A.2d at 555 n. 5. It is noted in both opinions that the information relied on must be sufficient, to justify the action by the officer in the field, at the time the broadcast or lookout was made. Id.; Hensley, supra, 469 U.S. at 232-33, 105 S.Ct. at 682-83.
These decisions are not inconsistent with our holding here. Both cases are unlike the present case because, when the defendants in those cases were seized, the only information known to the police was that which was known at the time of the broadcast. Neither case purported to hold that a reviewing court could not take into account additional information acquired after the broadcast, but before the stop, in order to determine if all of the information considered together is sufficient to justify the police action in the field. That issue was simply not before the Hensley and Haywood courts and, therefore, could not have been decided in those cases. That issue was squarely presented in Woodward and decided in a way that, if followed by this court, validates, as we hold in Part V, the Terry stop by Officers Pierce and Strong in this case.
There are other aspects of Haywood which, it might be argued, would require a *1132 different result in this case. We do not believe that to be the case but, in order to deal with those points, it is necessary to examine that case in more detail. In Haywood, Officer Romano received information from a reliable informant who had personally observed a man engaged in drug trafficking at a specified location. Romano then broadcast a lookout that was monitored by Sergeant Miller. Sergeant Miller, Officer Franck, and other officers went to the location indicated and observed one Tate, who fit the description of the drug seller provided by the informant. Sergeant Miller testified that, as the officers arrived at the scene, he saw Haywood giving money to Tate. When the officers left the car and approached, Haywood turned and walked away. Officer Franck then followed Haywood and placed him under arrest. A divided court, noting that it assumed for purposes of analysis that the tip broadcast by Officer Romano was reliable, held that the circumstances were insufficient to support a finding of probable cause with respect to Haywood. The majority concluded that even if there were sufficient grounds to conclude that Tate was engaged in drug trafficking, Haywood's association with Tate was insufficient for a probable cause finding as to him. Id. at 555-56.
In a footnote, the majority opined that: "[a]ppellant is correct when he suggests that the reliability of the informant should have been known to [the officer], who flashed the lookout, at the time when he asked any other police officers to act upon the tip." Id. at 555 n. 5 (citing Alabama v. White, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990); Glass v. United States, 395 A.2d 796, 804 n. 18 (D.C.1978); Clarke v. United States, 256 A.2d 782, 785 (D.C.1969)). Appellant, contending that the quoted language is controlling, argues that after-acquired information may not be used in the probable cause determination unless it is broadcast to the officers in the field before the initial broadcast is acted upon. In short, he contends that the quoted language in Haywood requires us to hold that, since insufficient grounds existed for a stop when the initial broadcast was made, the stop was unlawful.
That argument is not persuasive for several reasons. First, none of the cases cited by the Haywood court hold that information acquired after the initial broadcast may not be considered in determining whether probable cause exists. Second, the quoted language in Haywood is not the holding of the court. The majority assumed that there was probable cause to believe that Tate was a drug trafficker, and, relying on Smith v. United States, 558 A.2d 312, 314-15 (D.C. 1989) (en banc), held that Haywood's association with Tate was not of a nature to give rise to a conclusion that there was probable cause as to Haywood as well.[5]Id. at 555-56. Third, the court did not purport to rule that if the original information is insufficient it cannot be supplemented by later acquired, but untransmitted, information. Finally, the Haywood court did not cite and, therefore, did not consider whether the quoted language *1133 could be squared with Smith v. United States, supra, 123 U.S.App.D.C. at 204, 358 F.2d at 835. As discussed earlier in this opinion, in Smith, the information known to the originating officer (Lozowicki), at the time of the broadcast, was itself not sufficient to establish probable cause; but Lozowicki's communication was sufficient when considered together with the after-acquired information obtained by Thompson. For all of these reasons, we conclude that the quoted language from Haywood provides no barrier to our holding that the after-acquired information may be considered in determining whether reasonable grounds for a Terry stop existed.
In sum, we are satisfied that Woodward properly resolves this issue. We reach that conclusion because we believe the Woodward holding recognizes that when faced with a fast moving sequence of events involving a number of police officers, a citizen's rights are protected if, at the time of the intrusion, the information collectively known to the police is constitutionally sufficient to justify that intrusion. See Williams, supra, 113 U.S.App.D.C. at 372, 308 F.2d at 327 ("[I]n a large metropolitan police establishment the collective knowledge of the organization as a whole can be imputed to an individual officer when he is requested or authorized by superiors or associates to make an arrest"). We also note that Woodward principally relies on Smith v. United States, which is controlling authority for this court, and which recognizes that the corporate information available to the police department determines whether there is a sufficient basis for the police action.
Our dissenting colleague argues that a "logical conclusion" to be drawn from our holding is that it would permit the police to randomly pick up individuals, without any basis for doing so, and then to hold those who were wanted on outstanding unexecuted arrest warrants. Post 1137-1138. We find no basis for such a concern. In this case the after-acquired information was obtained by the very officer who initiated the original broadcast upon which Officers Pierce and Strong relied. Our conclusion would not necessarily be the same if the balance tipping information had been obtained by a different police officer who had played no part in either the investigation or the search for those responsible.
Also significant, in our view, is the relatively short interval between the broadcast initiated by Detective Reed (3:18 p.m.) and the stop and detention of appellant by Officers Pierce and Strong (3:47 p.m.). This was not a case where an initial (inadequately supported) broadcast was purposely made with the hope that after the passage of time, someone, somewhere, might communicate additional information to a law enforcement officer which, when considered along with the information previously available, cured any defects in the initial broadcast. As noted earlier, this investigation involved a fast-moving sequence of events involving a number of law enforcement officers at several different locations in one section of the city. Under those circumstances we do not share the concern expressed by our dissenting colleague, that our holding will lead to overbroad application of the collective knowledge doctrine.

V.
Finally, we examine whether there were sufficient facts, known to the police, to justify the Terry stop and detention of appellant at the time of the stop. We recently observed that
To justify an investigative detention under Terry ... the police must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. This minimal level of objective justification is considerably less than proof of wrongdoing by a preponderance of the evidence.... In reviewing a trial court order denying a motion to suppress, the facts and all reasonable inferences therefrom must be viewed in favor of sustaining the trial court ruling.
Peay v. United States, supra, 597 A.2d at 1319-20 (citation and internal quotation marks omitted). Applying that standard, and including in our determination the information gained by Detective Reed after the broadcast (but before the Terry stop), we are *1134 satisfied there was a sufficient basis for the stop.
The trial court found Detective Reed was in possession of the following information connecting appellant to the shooting. First, Harris had seen the shooting and had informed Detective Reed that it was committed by A. Harris also reported that, prior to the shooting, she had seen A. inside the Elmira corner-store located two doors from the laundromat where the shooting took place. Also present in the store with A. was another person whom she did not know. She saw the same person, again with A., 2-3 blocks south of the shooting scene, 15 and 30 minutes after the shooting. That encounter took place at a location consistent with the direction reportedly taken by the shooter when he left the scene. Harris described the person she had seen with A. on the two occasions, as wearing a black and white shirt when he was seen last by her. These facts were known to Detective Reed when she broadcast a lookout for A. and his companion at 3:15 to 3:18 p.m. In addition, after the 3:15-3:18 p.m. lookout was broadcast, Detective Reed learned from witnesses, other than Harris, that immediately before the shooting, two young malesone of whom was identified as the shooterhad argued with the decedent inside of the laundromat.[6] Approximately forty minutes after the second-sighting by Harris, Officers Pierce and Strong found A. on the street, a dozen blocks or so from where he had been observed by Harris, accompanied by someone (appellant) who fit the description of the person Harris had observed with A. both before and after the shooting. We are satisfied that these findings are amply supported by the record.
On the basis of these facts, the trial judge, drawing appropriate inferences, found that the police had a reasonable suspicion that A. and appellant were together inside the corner-store, two doors from the laundromat, before the shooting took place; that shortly afterwards A., with appellant present, had an argument with the decedent inside the laundromat; that almost immediately after the argument, A. shot the decedent; that 15-30 minutes after the shooting the two were still together, after having changed their clothes, when they were seen by Harris on Joliet Street, a few blocks from the shooting scene; and, that A. and appellant were still together approximately forty minutes later when Officers Pierce and Strong stopped them. The government argues, and we agree, that based on these facts there was sufficient articulable suspicion that A. had committed a murder, and that he had been aided and abetted in the commission of that offense by appellant. It may be that these facts would not support a guilty verdict against appellant as an aider and abettor to a murder. See Creek v. United States, 324 A.2d 688 (D.C.1974). However, the standard required to justify a Terry stop is not proof beyond reasonable doubt, clear and convincing evidence, or even a preponderance of the evidence. United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (standard is "considerably less than proof of wrongdoing by a preponderance of the evidence"). The standard is reasonable suspicion and, on these facts, we are satisfied that standard was met. See Smith v. United States, 561 A.2d 468, 471 (D.C.1989); United States v. Lewis, 486 A.2d 729, 733 (D.C.1985).[7]
For the reasons stated, the judgment of the trial court is
Affirmed.
FERREN, Associate Judge, dissenting:
My colleagues rightly point out that the "collective knowledge" doctrine is well-established in this jurisdiction. But the majority holding in this case stretches that doctrine to the breaking point in concluding that a Terry stop may be justified by knowledge that is never communicated in any form whatsoever to the officers who make the stop. This holding disregards a prior opinion of this *1135 court and goes well beyond established precedent in this or any other jurisdiction. Accordingly, while I have no quarrel with parts I-III of the majority opinion, I must respectfully dissent from part IV and, as a consequence, do not need to address part V.
In its usual form, the collective knowledge doctrine, also known as the "fellow officer rule," stands for the common sense principle that an officer who seizes a suspect need not have personal knowledge of all the facts and circumstances that justify the seizure, as long as the officer is responding to a directive or other communication that was itself based upon facts sufficient to warrant this action.[1] This last proviso is important; typically the courts have refused to extend the doctrine to situations where the seizing officer is not acting either on a validly issued directive or on some other form of communication that, combined with his or her own observations, justifies the stop. Thus, in Whiteley v. Warden, Wyoming State Penitentiary, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971), the Supreme Court freed a state prisoner who had been arrested pursuant to a bulletin that had been issued on the basis of an invalid warrant. In concluding that the affidavit filed by the sheriff to obtain the warrant was defective because it was barren of any factual detail, id. at 564-65, 91 S.Ct. at 1035, the Court also noted that the defective affidavit could not be rehabilitated by additional information allegedly known to the sheriff when he filed the affidavit but never communicated to the magistrate issuing the warrant, id. at 565 n. 8, 91 S.Ct. at 1035 n. 8, nor could the arrest be validated by the fact that the officers were relying in good faith on the bulletin, id. at 568, 91 S.Ct. at 1037. By comparison, in United States v. Hensley, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985), the Court found that a Terry stop based on a flyer issued by police in another state was valid because the issuing police had reasonable grounds for making such a stop themselves.
Assuming the police make a Terry stop in objective reliance on a flyer or bulletin, we hold that the evidence uncovered in the course of the stop is admissible if the police who issued the flyer or bulletin possessed a reasonable suspicion justifying a stop and if the stop that in fact occurred was not significantly more intrusive than would have been permitted the issuing department.
Id. 469 U.S. at 233, 105 S.Ct. at 682 (emphasis in original, citation omitted).
Accordingly, while the seizing officers need not know all the facts and circumstances justifying the seizure, there must be a connectionestablished by a valid directive or other communicationbetween these justifying facts and the resulting seizure. We observed in Haywood v. United States, 584 A.2d 552, 556-57 (D.C.1990) (citations omitted, emphasis in original):
While the collective knowledge of the police can give rise to a valid arrest, this is so only if the arresting officer acts in response to a broadcast or other directive which is based on the collective information.... An arresting officer need not have firsthand knowledge of the facts giving rise to probable cause provided that he or she is acting at the suggestion of someone who does. ... In cases ... where probable cause for arrest is predicated in part on the personal observations of the arresting officer, the court may not rely on facts which were available to other officers at the scene unless that information was communicated to the arresting officer.[2]
In other words, all the information imputed to the seizing officer must normally have been communicated to that officer in some form, however abbreviated, in order to be *1136 considered by the court in determining whether the stop was adequately justified.[3]
This is not to say that any single officer must know individually all of the elements necessary to warrant a stop. See Smith v. United States, 123 U.S.App.D.C. 202, 204, 358 F.2d 833, 835 (1966) (citing Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963)), cert. denied, 386 U.S. 1008, 87 S.Ct. 1350, 18 L.Ed.2d 448 (1967). Moreover, the seizing officers may also supplement any directive they receive with other information that they subsequently discover on their own. See Smith, 123 U.S.App.D.C. at 205, 358 F.2d at 836. My point is simply that the government cannot justify a seizure by relying on facts that never played any part in the chain of reasoning that led to the seizing officers' decision to make the stop.
Both Smith and Woodward v. State, 668 S.W.2d 337 (Tex.Crim.App.1982) (en banc), cert. denied, 469 U.S. 1181, 105 S.Ct. 939, 83 L.Ed.2d 952 (1985), which my colleagues cite in support of their conclusion, fit within this understanding of the collective knowledge doctrine. In both cases, the knowledge that was imputed to the arresting officer had been communicated to him in some form. In Smith, the informant's tip was relayed to the arresting officer by another officer, albeit without specific information about the informant's reliability. In Woodward, the arresting officer knew that there had been a statewide bulletin issued by the Austin police to stop the defendant for questioning in connection *1137 with a homicide and that the defendant had recently been sighted 90 miles away from the scene of the crime. In each case the arresting officer then added to this information further relevant knowledge of his own. Thus, the reviewing court was entitled to consider both the information underlying the initial directive and the additional facts later known to the arresting officer in considering whether there was an adequate ground for the stop in question.
In this case, by contrast, the majority concludes that the stop of appellant was justified by critical information that played no part in the lookout broadcast and was never made known in any form to the seizing officersor to anyone else, for that matterbefore appellant was stopped. My colleagues suggest that this information eventually became part of the collective knowledge underlying the dispatcher's initially improper lookout instruction, and should be deemed a part of that collective knowledge before appellant was stopped, for one reason: without telling a soul, Detective Reed consciously decided, after learning the additional information, that any rebroadcast of the original (defective) lookout was unnecessary. But silence cannot be an adequate basis for justifying a search or seizure; there must be an affirmative act or acts communicating sufficient relevant knowledge, either directly or indirectlyfor example, through a dispatcher or a flyerto the seizing officers.[4] There may, of course, be circumstances where an initial tip or directive, inadequate in itself to support the actual seizure, is later supplemented by additional information, discovered by or relayed to the arresting officer, that justifies the stop, as in Smith and Woodward. But I know of no case holding, as the majority does here, that an invalid directive may be retroactively rehabilitated by new information that is never communicated in any form, through a dispatcher or otherwise, to the officers who actually make the stop.[5]
My colleagues claim that requiring an officer in Detective Reed's position to initiate a new lookout[6] would not provide any additional protection to citizens from unlawful police conduct. I emphatically disagree. The position adopted by the majority would allow the police, without sanction, to issue and act on premature seizure orders in the expectation that, by the time of the seizure, someone somewhere in the police system will have adequate information justifying detention. Taken to its logical conclusion, this view would permit random sweeps of allegedly "high crime" neighborhoods to check identities and pick up persons who are wanted on outstanding warrants.[7] It is because of this *1138 danger that jurisdictions adopting the collective knowledge doctrine have carefully confined it to situations where the seizing officers are acting on the basis of a valid seizure order and/or other information that they discover or that is communicated to them in some form. As the Colorado Supreme Court has warned, "The fellow officer rule ... is not a means of creating probable cause by using post hoc combinations of information available to the police." Hazelhurst, 662 P.2d at 1087.
I vote to reverse and remand with an order that appellant's confession, tainted by his unlawful arrest, must be suppressed.
NOTES
[1] This was contrary, however, to what other witnesses had told the police.
[2] The police may not, however, in the absence of probable cause, take someone into custody for purposes of interrogation in the hopes that something incriminating will be elicited. See Dunaway v. New York, supra, 442 U.S. at 214-16, 99 S.Ct. at 2257-58 (detention to conduct a custodial interrogationregardless of label applied to the detentionis an arrest which must be supported by probable cause).
[3] Appellant asserts in his reply brief, without citation to the transcript, that appellant was frisked. The government makes no representation, one way or the other, on the question of whether a frisk was conducted. Our own examination of the transcript of the testimony of Officer Pierce reveals that he was neither asked nor did he mention whether or not A. or appellant were frisked.
[4] At oral argument, counsel for the government halfheartedly attempted to withdraw that concession, arguing that reasonable suspicion did exist even without the additional information. Appellant's reply brief and his oral argument were premised on the government's concession and appellant's counsel was not, for good reason, prepared to argue otherwise. We do not decide the issue. We assume, for purposes of this analysis only, that without the information regarding the argument inside of the laundromat, a factual basis for a Terry stop was not met.
[5] The court also gave consideration to the fact that there was nothing in the record concerning the extent of Franck's knowledge at the time he placed Haywood under arrest. In an alternative finding, the court hypothesized that even if there were sufficient grounds to arrest Haywood based on his association with known drug trafficker Tate (a finding which it unequivocally rejected)the arrest would still be illegal since there was no showing in the record that the actual arresting officer (Franck) was aware of any of the facts which would establish probable cause. That conclusion of the Haywood majority does not affect our holding in this case for two reasons. First, it is clearly not the holding of the court and to the extent the majority reached that result on that point, it is dictum. Second, it is not at all inconsistent with our resolution of this case. In Haywood the record was absolutely barren on the question of what Franck knew when he placed Haywood under arrest. Only Sergeant Miller testified at the hearing and there was no testimony that Miller provided any information to Franck or that Franck was aware of the contents of Romano's broadcast relating to Tate. Thus, unlike this case, Woodward, Smith, and the other cases cited in this opinion, there was no information at all, so far as the record reveals, communicated to Franck. In this case, of course, a command was given by the dispatcher to stop appellant. That communication was made at a time when there was inadequate information to justify such a stop. When the stop was made, however, the original information had been supplemented so that the stop could be legally justified. In contrast, the Haywood majority found that Franck acted without any direction at alla circumstance that does not apply to the facts of this case.
[6] There was testimony, however, that A. was arguing with the decedent but that M.E.B. did not take part in the dispute.
[7] We find no merit in appellant's final claim that probable cause was lacking even after the identification procedures and after A. informed Detective Reed that appellant had shot the decedent. See In re G.O.B., 343 A.2d 567, 568-69 (D.C. 1975).
[1] See, e.g., Williams v. United States, 113 U.S.App.D.C. 371, 372, 308 F.2d 326, 327 (1962) ("in a large metropolitan police establishment the collective knowledge of the organization as a whole can be imputed to an individual officer when he [or she] is requested or authorized by superiors or associates to make an arrest").
[2] It is noteworthy that in making these observations, the Haywood court cited Smith v. United States, 123 U.S.App.D.C. 202, 358 F.2d 833 (1966), cert. denied, 386 U.S. 1008, 87 S.Ct. 1350, 18 L.Ed.2d 448 (1967), upon which the majority relies so heavily here.
[3] See United States v. Edwards, 885 F.2d 377, 382 (7th Cir.1989) ("A supervising officer's knowledge about a defendant cannot be relied upon to provide probable cause for his arrest where there is no evidence that such knowledge was communicated to the agents on the scene who actually made or ordered the defendant's arrest."); United States v. Woods, 544 F.2d 242, 259 (6th Cir. 1976) (superior officer's knowledge cannot be considered in determining probable cause, where there is no evidence that his order was basis of defendants' arrests), cert. denied, 429 U.S. 1062, 97 S.Ct. 787, 50 L.Ed.2d 778, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361, (1977); People v. Hazelburst, 662 P.2d 1081, 1087 (Colo.1983) (fellow officer rule did not supply basis for detention of defendant, where arresting officer had been given no information implicating defendant, even though such information was known to investigating officer); State v. Cooley, 457 A.2d 352, 355 (Del.1983) ("To say in the abstract that probable cause is to be evaluated on the basis of the collective information of the police ignores the underlying assumptionand factual realitythat there is some communication between those officers, who do know facts amounting to probable cause, and those who do not."); State v. Crowder, 1 Haw.App. 60, 613 P.2d 909, 915 (1980) (imputation of collective knowledge not available where there was no evidence that any officers communicated with each other or that arresting officer was acting on directive from fellow officer); Salter v. State, 163 Ind.App. 35, 321 N.E.2d 760, 762 (1975) (one officer's knowledge of probable cause could not justify arrest by another officer, absent any evidence of communication between them); State v. Martin, 232 Neb. 385, 440 N.W.2d 676, 682 (1989) (fact that there was a warrant outstanding for defendant's arrest does not make the arrest lawful, where this fact was not known to arresting officers and was not the basis for actual arrest); State v. Mickelson, 18 Or.App. 647, 526 P.2d 583, 584 (1974) (Police officers cannot "search on the hope that the total knowledge of all those officers involved in a case will later be found to constitute probable cause if the search is challenged.... Cases in which courts have adhered to [the collective information] principle are those where the arresting officer acted with an awareness or reasonable belief that fellow officers have information sufficient to constitute probable cause.... [S]omewhere in joint police action there must be a nexus between the probable cause and the invasion of privacy, between the justification and the act.") (citations omitted); Commonwealth v. Gambit, 274 Pa.Super. 571, 418 A.2d 554, 557 (1980) ("In no instance has an arrest been justified where the information providing probable cause was known only to officers unconnected with the arrest. What is missing here is some communication or connection between [the arresting officer] and the officers who heard the ... broadcast."), aff'd, 501 Pa. 453, 462 A.2d 211 (1983).

In a very few cases, some courts have imputed knowledge known by one officer to a partner working as part of the same arrest team "in a close time-space proximity to the questioned arrest." 2 WAYNE R. LAFAVE, SEARCH & SEIZURE § 3.5(c) at 17 (2d. ed. 1987). See United States v. Ragsdale, 470 F.2d 24 (5th Cir.1972) (knowledge of one officer could be imputed to partner where both involved in automobile stop, and first officer told second officer of gun in auto, but partner apparently did not hear this remark); Commonwealth v. Wooden, 13 Mass.App.Ct. 417, 433 N.E.2d 1234 (1982) (imputing knowledge of one officer to another, where both were working in concert and within arm's reach of each other and of suspects). This exceptionwhich in any case appears to conflict squarely with the language quoted in the text above from Haywood does not apply to the facts before us, given that Detective Reed was not a member of the team that stopped appellant and was far away from the scene of the stop.
[4] See cases cited supra at note 3.
[5] Indeed, in the one case with circumstances most closely approximating those before us, albeit in a jurisdiction that has not accepted the collective knowledge doctrine, the court rejected this proposition. See People v. Ford, 150 Cal. App.3d 687, 198 Cal.Rptr. 80, 88 (1984). Compare People v. Beard, 35 Ill.App.3d 725, 342 N.E.2d 343, 348 (1976) (information not specifically known by arresting officer could be considered in finding probable cause where this information was communicated to police headquarters and headquarters then reconfirmed earlier bulletin to stop and investigate).
[6] To make my position clear, I believe that it would not be sufficient for an officer in Detective Reed's position merely to communicate the new information to the dispatcher. Only a new lookout broadcast, based on the new information, would satisfy the requirement that there be a connection between the information justifying the seizure and the seizure itself.
[7] I do not believe that this concern is unwarranted, as my colleagues suggest. The majority opinion relies on an extraordinarily broad formulation of the collective knowledge doctrine and then disregards, without adequate justification, a basic and widely recognized limitation on the application of that doctrine to situations such as the one in this case. In response to this dissent, my colleagues appear to acknowledge that the collective knowledge doctrine does not extend to the entire police force. They intimate, moreover, that particular knowledge may be added to the justification for a seizure only when that knowledge has been obtained by a member of the investigating team and when the delay between the improperly issued seizure directive and the seizure itself is relatively short. But such standards are, I fear, subject to considerable manipulation. Moreover, the position taken by my colleagues, instead of promoting a proper regard for citizens' Fourth Amendment rights, tacitly approves sloppy police practice by justifying seizures on the basis of directives that admittedly were improperly issued. I see no reason to encourage such a practice. When we are justifying a seizure based, necessarily, on collective knowledge, I believe it is critical that we hold the police to an easily understood, bright-line definition rather than permit an exceptionas in this casebased on a single officer's judgment that a shortcut is permissible. See Ford, supra note 5, 198 Cal.Rptr. at 88 ("no societal or legitimate police purpose exists for encouraging the issuance of a `be on the lookout for' memorandum in the first place without probable cause").